# COURT OF APPEALS.

## May 28, 1918.

## THE PEOPLE v. JOSEPH COHEN.

### (223 N. Y. 406.)

MURDER—INDICTMENT AND CONVICTION OF DEFENDANT AS A CONSPIRATOR IN COMMITTING.

The defendant was indicted and convicted of murder in the first degree in that he entered into a conspiracy with others for that purpose. On examination of evidence, *held*, that it presented a question which could only be solved by a jury.

SAME—EVIDENCE—WHAT EVIDENCE SUFFICIENT TO SHOW ACCUSED WAS AN ACCOMPLICE PARTICIPATING IN THE CRIME.

To constitute an accomplice one must be so connected with the crime that at common law he might himself have been convicted either as the principal or as an accessory before the fact. To warrant such a conviction the one accused must have taken part in the preparation of, or preparation for, the crime, with intent to assist in the crime. Enough must be shown to justify the inference that the offender has counseled or induced or encouraged the crime.

SAME—WHAT MUST BE PROVED OUTSIDE OF THE TESTIMONY OF AN ACCOMPLICE TO SUSTAIN JUDGMENT OF CONVICTION.

The statute does not require that the whole case should be proved outside of the testimony of an accomplice, but simply requires evidence from an independent source of some material fact tending to show not only that a crime had been committed but that the defendant was implicated in it. The facts, including defendant's own statements and denials, show that there is ample evidence to corroborate the evidence given by one of his accomplices.

SAME—TRIAL—DUTY OF DEFENDANT'S COUNSEL TO COMPEL WITNESS TO ANSWER AT TIME OF TRIAL.

A witness who testified that he had engaged two men to commit the murder and that they were the two men who finally succeeded, refused to give their names or residences. At the close of the trial some four weeks later the defendant moved that the court compel the attendance of the witness and direct him to answer the questions with reference to

the names and identity of the men, which he had refused to answer. *Held*, that it was the duty of the defendant's counsel, if he deemed the evidence important for his client, to ask the court to require the witness to answer at the time.

SAME—WHEN RULE THAT COURT MUST CHARGE THAT DEFENDANT MAY BE CONVICTED OF INFERIOR CRIME NOT APPLICABLE.

The court charged that it was unnecessary to define deliberation and premeditation because of the statement made by the counsel of the defendant in his summing up, that if the defendants were concerned in the murder they were guilty of murder in the first degree, and if they were not concerned in it they should be acquitted. But as a precaution he asked the counsel of the defendant if that was his attitude and received an answer that it was. *Held*, that while the court is often bound on request of counsel to charge that the jury may find the defendant guilty of a crime inferior to that charged in the indictment, such a rule is not applicable in this case.

SAME—THE FACT THAT JURY FOUND ONE OF SEVERAL CONSPIRATORS GUILTY OF MURDER IN FIRST DEGREE AND THEN RETIRED AND AFTERWARDS CON-VICTED ANOTHER OF MANSLAUGHTER NOT GROUND FOR REVERSAL OF JUDG-MENT OF CONVICTION FOR MURDER.

The jury when it came into court found the defendant guilty. It then retired and when it returned found one, of the other defendants guilty of manslaughter. *Held*, that while the procedure adopted was unusual, it was not improper and this defendant has no cause for complaint. (Code Crim. Pro., §§ 433-454.)

APPEAL from a judgment of the Supreme Court rendered August 17, 1917, at a Trial Term for the county of New York, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Frank Moss,* for appellant.

The judgment must be reversed because the court did not submit any degree of homicide lower than murder in the first degree, as to the appellant — although it submitted such lower degrees as to the co-defendant Graff, who was convicted of manslaughter, the evidence as to both defendants being identical in substance. The court also erred in receiving and accepting

two verdicts in the case. (People v. Munroe, 190 N. Y. 435; People ex rel. Stabile v. Warden, etc., 124 N. Y. Supp. 341, 139 App. Div. 488, 202 N. Y. 138; People v. Massett, 7 N. Y. Supp. 839; People v. Young, 96 App. Div. 33; People v. Grainger, 187 N. Y. 67; People v. Schleiman, 197 N. Y. 383; People v. Brown, 203 N. Y. 44; People v. Gerdvine, 210 N. Y. 184; People v. Carbone, 156 N. Y. 413; People v. Corey, 157 N. Y. 333.) The case was sent to the jury with the testimony of the principal witness Cardinale incomplete, by reason of his contumacious refusal to answer certain fundamental questions. The court overruled defendant's proper motions at the close of the case and permitted the testimony of this witness to be practically unaffected by his refusals to answer questions and it declined to give the jury proper instructions in the matter. The court failed to keep its promise made to defendant's counsel to attend to the matter. In all this the defendant was deprived of his rights of confrontation by an accusing witness under the State and National Constitutions. (People v. McCarroll, 3 Parker's Cr. Rep. 73.) The case against Joseph Cohen rests on "accomplice testimony," and lacks evidence corroborative of said testimony and tending to connect him with the commission of the crime of which he was convicted, as required by section 399 of the Code of Criminal Procedure. (People v. Butler, 62 App. Div. 508.) The court erred in charging the jury as to the corroboration required in the case under section 399 of the Code. (People v. Sweeney, 213 N. Y. 37.) The summation by the prosecutor was prejudicial to the defendant's rights in the presenting of arguments not warranted by the evidence and calculated to inflame and mislead them, and in containing many erroneous propositions and statements. (State v. Cousins, 58 Iowa, 250; People v. Monday, 117 N. E. Rep. 286; People v. Sweeney, 41 Hun, 332; People v. Wolf, 183 N. Y. 464; People v. Fielding, 158 N. Y. 547; People v. Greenwall, 115 N. Y. 520; People v. Brooks, 131 N. Y. 321; People v. Cascone, 185 N. Y. 334.)

*Merton E. Lewis, Attorney-General (James O'Malley, Alfred L. Becker* and *Robert S. Conklin,* of counsel), for respondent.

The charge of the court that the appellant was guilty of murder in the first degree or not at all, and the omission to submit (as to the appellant) any degree of homicide lower than murder in the first degree was not error.   Taking a verdict of guilty of murder in the first degree as to appellant and verdicts of not guilty as to the co-defendants David Jacobs and Jacob Cohen at one time, and later a verdict of manslaughter in the first degree as against the defendant Abraham Graff, was not error. (People v. Monat, 200 N. Y. 308; People v. Schmidt, 216 N. Y. 324; Cancemi v. People, 18 N. Y. 128; Pierson v. People, 79 N. Y. 424; People v. Guidici, 100 N. Y. 503; Buel v. People, 78 N. Y. 492; People v. Monat, 200 N. Y. 308; People v. Corey, 157 N. Y. 333; People v. Schleiman, 197 N. Y. 383.) The fact that the co-defendant Graff benefited from a supplementary charge as to lesser degrees of homicide in no way increased appellant's rights.   (People v. Kief, 126 N. Y. 661; People ex rel. Stabile v. Warden, 202 N. Y. 139; State v. Bogue, 31 N. C. 360; Brister v. State, 26 Ala. 107; State v. Gustave, 27 La. Ann. 395.)   The appellant need not receive less than his deserts because the jury was merciful to his co-defendant Graff.   (People v. Munroe, 190 N. Y. 435; Delaney v. People, 10 Mich. 241; Rex v. Plummer, 1902, 2 K. B. 339; People v. Kief, 126 N. Y. 661; White v. People, 32 N. Y. 465; United States v. Harding, Fed. Cas. No. 15,301.)   No error was committed with respect to the refusal of the witness Cardinale to name the gunmen.   The appellant failed to raise the point in time or in a sufficient way, for the evident reason that appellant's counsel preferred to argue to the jury the effect of Cardinale's refusal on his credibility rather than run the risk that an insistence upon Cardinale naming them would result in his doing so.   (Kimball v. Davis, 19 Wend. 437; Sturm v. A. M. Ins. Co., 63 N. Y. 77; Wright v. Cabot, 89 N. Y. 570;

Bird v. Halsy, 87 Fed. Rep. 671; Forrest v. Kissam, 7 Hill, 463, 25 Wend. 651; People v. Cole, 43 N. Y. 508, 2 Lans. 370; Curtice v. West, 50 Hun, 47, 121 N. Y. 696; Gallagher v. Gallagher, 92 App. Div. 138; Calhoun v. Commonwealth Trust Co., 124 App. Div. 633; People ex rel. Taylor v. Forbes, 143 N. Y. 219; People v. Priori, 164 N. Y. 459.) There was ample corroboration of the testimony of the accomplice Cardinale to connect defendant with the conspiracy to murder Baff, and to meet the requirements of section 399 of the Code of Criminal Procedure. (People v. Swersky, 216 N. Y. 471; People v. Zucker, 20 App. Div. 363; People v. Bright, 203 N. Y. 73; People v. Elliott, 106 N. Y. 288; People v. Hooghkerk, 96 N. Y. 149; People v. Ryland, 97 N. Y. 126, 28 Hun, 568; People v. Jaehne, 103 N. Y. 182; People v. Mayhew, 150 N. Y. 346; People v. Everhardt, 104 N. Y. 591.) There was no error in the court's charge with respect to the corroboration of accomplices and connection of defendants with the crime required under section 399 of the Code. (People v. Koenig, 180 N. Y. 155; People v. Johnson, 185 N. Y. 219; People v. Gilbert, 199 N. Y. 10; People v. Swersky, 216 N. Y. 471.) The summation for the People was fair and not prejudicial to the defendant. (People v. Doody, 174 N. Y. 166.) The charge of the court was fair and impartial, and was not prejudicial to the defendant's rights. (People v. Koenig, 180 N. Y. 155; People v. Johnson, 185 N. Y. 219; People v. Gilbert, 199 N. Y. 10; People v. Leach, 146 N. Y. 392.)

ANDREWS, J.:

Upon an appeal from a conviction of murder in the first degree but two questions are presented to us. Was the trial fair and was there sufficient evidence to support the verdict? Does the record disclose material errors which affect the substantial rights of the defendant? We may not substitute ourselves for the jury. If diverse inferences may properly be drawn from the testimony; if witnesses contradict each other, or if their

character is criticized; if the probability of the stories told by them is questioned; if their interest in the result may influence them, it is for the jury to decide where the truth lies. We may not reverse its finding because some of us or all of use would have hesitated to reach the same conclusion.

On the evening of November 24, 1914, Barnett Baff was shot down in a public street in New York City by two Italian gunmen. These gunmen were the tools of one Antonio Cardinale. Whether Cardinale was himself the tool of the defendant, Cohen, was the question at issue. Baff was a poultry dealer in a large way. Because of his unfair business methods great hostility existed against him among his competitors, and also among the slaughterhouse men to whom the poultry was sold. Among these latter was Cardinale, and his feeling toward Baff was bitter. Cohen was not a dealer but unloaded poultry from the cars for many of those who were, and was interested, financially, in two or more slaughterhouses. In this last enterprise he had lost considerable money. His position toward Baff is in dispute. It may fairly be inferred, however, that it was not friendly, and that he sympathized with those who thought they had cause of complaint against him.

The claim of the State is that with this situation as a motive, Cohen and others entered into a conspiracy for the murder of Baff, and that to effectuate it they employed Cardinale. As the very basis of this claim reliance must be placed upon Cardinale's testimony. If that is rejected as unworthy of belief the prosecution must fail. Cardinale is a self-confessed criminal of a dangerous and vicious type. He was brought here from Italy under the pledge that he should not be prosecuted for his crimes in this State. He may have the hope that if he convinces our courts that he was not the principal in the murder, any punishment to which he might be exposed under the Italian law would be lessened or escaped. His word is to be taken with great caution.

The indictment charges Joseph Cohen, Jacob Cohen, David

Jacobs, William Simon, Abe Graff and Moe Rosenstein with the murder of Barnett Baff. Of these, Rosenstein pleaded guilty to manslaughter and was used as a witness for the People. The indictment against Simon was dismissed. The other four defendants were tried together. The jury acquitted Jacob Cohen and David Jacobs. It found Abe Graff guilty of manslaughter in the first degree and Joseph Cohen guilty of murder in the first degree. Joseph Cohen has appealed from the judgment entered on this verdict.

The story of Cardinale so far as it affects Joseph Cohen was substantially as follows: He is an Italian, twenty-nine years of age. He came here seventeen years ago when he was twelve. He spent a year in school and then was employed in various places in the manufacture of pocketbooks. He evidently thought that he could better himself by entering into the chicken business, and in May, 1913, he and his brother-in-law, Campo, set up a slaughterhouse. In it the two men put all the money they could raise. They bought their chickens from various dealers at the West Washington market. On one occasion when it was impossible to buy chickens otherwise for his trade, Cardinale met the defendant, Cohen, for the first time and Cohen by his influence helped him to procure what he needed. From that time on he saw Cohen frequently and the defendant began to complain to him of Baff and his practices. Finally he suggested to Cardinale that in some way they should frighten Baff and so reform him; that they should place a bomb in or near his house. Cardinale had a driver named Sorro and he said to Cohen that Sorro would do the work. The bomb was in fact placed in front of Baff's house at Arverne, but failed to explode, and Cardinale told the defendant what had been done, and he asked him for money for Sorro. Sorro came to Cohen for the same purpose.

The business of Cardinale & Campo was not flourishing and Campo wished to retire. The defendant suggested that his brother-in-law, Jacobs, would make a good partner for Car-

dinale. And while the negotiations to that end were pending he came up and looked over Cardinale's slaughterhouse. There-after, in July, 1913, Jacobs did buy out Campo and the firm of Cardinale & Jacobs was formed.

As the bomb had failed to frighten Baff, the defendant sug-gested that Cardinale should send a black hand letter to Baff. He next suggested that the slaughterhouse of a man named Newmark, who was a friend and ally of Baff, should be burned and he offered $200 or $300 for the job. The fire occurred and Cardinale talked with the defendant afterwards about the payment of money for this service. Later Cohen told Cardinale to hire some one to poison Baff's horses, promising $15 or $25 for each horse killed. He told him where he could get the poison, and after one or more horses had been killed in this way Cardinale told Cohen the result.

These various attempts having no effect, Cohen, who had all along expressed great bitterness against Baff, finally proposed that he should be killed. He said to Cardinale that the latter, doubtless, could find good boys uptown for the job, and that there was $500 in it.

Acting under these instructions, Cardinale tried to hire one Greco to kill Baff. Greco, however, was not satisfied with the reward, and Cardinale told Cohen that Greco did not think $500 was enough. Cohen thought it was. Finally, Cohen came to negotiate personally with Greco. He met him and promised him $700.

Thereafter, various schemes were made for the murder. It was first planned to shoot Baff at his Brooklyn market and Cardinale discussed this matter with Cohen. It was next planned to shoot him at his Eightieth street market, and Cohen was told of this fact, then at One Hundred and Ninth street, then at Washington market, where Baff had his principal place of business. Greco and his tools seemed afraid to act and Cardinale told Cohen of this fact. Then Greco concluded that

he would like a small rifle with a silencer. Cardinale told Cohen and Cohen ordered him to buy one at a place in Hoboken.

Meanwhile, Cardinale and Jacobs did not prosper in their business and they sold out in September, 1914. This did not end, however, Cardinale's interest in the conspiracy against Baff. He thought that his failure was largely due to Baff's actions, and Cohen, who had put up considerable money for Cardinale & Jacobs and who had lost in the venture, seems to have thought so also.

The attempt to buy the rifle in Hoboken was a failure, and Cohen then sent Cardinale to Greco with $10 on the theory that. Greco could obtain one. The rifle was bought and given to Greco, but although various plans were tried Greco accomplished nothing. There were complaints about this delay and he finally retired from the job. But he knew of two boys, whose names the witness refused to give, who might do it and he sent Cardinale to them. Under these circumstances, Cohen raised his offer to a thousand dollars. The two boys refused to take the job for that sum and Cohen then raised it to $1,500. Thereupon, they accepted and Cardinale brought one or both of them down to look the ground over. He told Cohen this fact. There were certain lofts over the stores in the market. It was planned to shoot Baff from one of these with the silenced rifle. Cohen was told this fact, and he took Cardinale up into one of the lofts to determine whether it was suitable for the purpose. The gunman wished to stay in this loft over night so that he might have a chance at Baff when he came early in the morning, and Cohen brought bags for the gunman to sleep on. The plan was a failure, and later the gunman went to another loft from which he hoped to waylay Baff, and Cohen was told of this also. This plan too failed.

It was next arranged that the gunmen should go down to the market in an automobile with which to escape after Baff had been shot, and Cohen was informed of this fact. Cohen did not wish to be present when the murder was committed and finally

Cardinale told him that the gunmen would come with the car on the afternoon of Tuesday, November 24, 1914. They did come. Baff was lured out of his store by a telephone call; he was shot and the gunmen escaped in the automobile.

The night after the murder, Cardinale went to Cohen's house in Brooklyn to obtain money for the gunmen. When he went in David Jacobs and his wife and the defendant's wife were present. Cohen came in later. He warned Cardinale against coming to see him and promised to send money the next day. He again saw Cohen later about money for the murder, and still later he had a talk with Cohen, in which Cohen told him that Rosenstein who was involved in the various transactions was going to squeal.

As will be seen a great part of this story, which contains many circumstances omitted here, does not of itself directly affect Cohen. It relates to acts done in his absence. The details are important chiefly because if untrue or improbable they cast doubt upon Cardinale's testimony. The essential part is that he committed this or that act at Cohen's request; that he reported the result to Cohen and that Cohen himself made admissions to him that clearly connected him with the murder. The jury needed to consider whether in this regard Cardinale was corroborated.

First it may be said that the theory of the defense that Cardinale is solely responsible for the murder does not correspond with the facts as they are shown upon this trial. He seems not to have been intimate with Rosenstein who was a hanger-on in the Washington market, and yet Rosenstein took part in the murder as appears by his own confession and by the evidence of the People's witness, Lowenstein. There was evidence, which the jury evidently believed, which connected Abe Graff, an employee of Werner, one of the large dealers in the market, and, at least, an acquaintance of Cohen, with the crime. It is likely that the various attempts against Baff must have involved considerable expense, and, apparently, Cardinale had lost what-

ever property he had in his unsuccessful venture as a slaughter-house man.   It is also true that the cross-examination of Cardinale was unsuccessful from the view point of the defense. There was some discrepancy with regard to his story as to who carried the bomb obtained from Greco to Cardinale's market. His hostility to Baff was made apparent.   There was some discrepancy between his story and the story told by others as to who sent the telephone massage to Baff which brought him out of the store when he was killed.   There is a discrepancy between his story of the murder and the confession with regard thereto once made by one Ferrara, and, finally, he refused to give the the names of the two gunmen who actually did the shooting.   Yet on the whole, his testimony was not shaken.   The most serious consideration with regard to it is that he does not claim a substantial payment from Cohen for his services.   He does say that Cohen promised to back him in a new business enterprise, but no definite promise was given to him.   This can only be explained on the theory that because of his feelings toward Baff he was perfectly ready to take part in the alleged conspiracy.

So far as direct corroboration by other witnesses of his story of Cohen's relations with himself is concerned, it is as follows: Joseph Sorro, who is alleged to have placed the bomb on the porch of Baff's Arverne residence, and who was driver for Cardinale, says that after Cardinale had suggested to him that he do it he spoke to Cohen with Cardinale about the matter; Cardinale told Cohen that Sorro was to do the job and Cohen replied that he did not care who did it, but that he wouldn't pay more than $300.   The day after the bomb was set he went again to see Cohen with Burke and Nino, the two men with him when he carried the bomb to Arverne.   He told Cohen that they wanted the money promised, and on that and on another occasion a conversation is said to have occurred which if true shows that Cohen was implicated in the plot.   Later Sorro was indicted for the bomb transaction.   And he says he went down to Wash-

ington market with a police officer, Romano, dressed as a chauffeur, and introduced him to Cohen as his brother-in-law, evidently with the intention of getting evidence against the latter. He demanded $200 of Cohen. Cohen denied any knowledge of the bomb and said that they were framing up something against him. Later on two occasions he went over to Brooklyn and met Cohen in the street. And again with Romano on each occasion he had a talk of some length with Cohen, and while Cohen persisted in his denial, the conversation was not such as would have occurred between an innocent man and one who as that man thought was trying to frame up a charge against him. Romano testifies to the conversation in Washington market substantially as it is told by Sorro. He says that he was present at the first conversation in the Brooklyn street, and that Cohen warned Sorro against meeting him in the market as detectives were watching him. He says this conversation lasted half an hour. He also testifies as to the second conversation. Again the conversations are not consistent with any idea on Cohen's part that Sorro was framing up a charge against him. Another officer, named Feudner, testifies that he saw Ferro and Romano in conversation with Cohen on the second occasion, and that the conversation lasted about an hour. Cohen's own testimony is that he met Sorro and Romano on only one occasion on the street in Brooklyn; that he feared some attack from them and that he left them as soon as he could do so.

Frank Burke says that he was present on both occasions when money was demanded of Cohen for the work of placing the bomb, and he corroborates Sorro's story. He also speaks of writing such letters to Cohen as showed the latter's connection with the crime. Burke had served a term for grand larceny; he had been accustomed to take opium, and he was a man of bad character. So, evidently, was Sorro.

As to the Newmark fire, Sorro says that Cardinale told him in Cohen's presence that the latter wished him to set the fire, and that he refused. Then at Cardinale's request he brought Greco

and after some negotiations Greco agreed to do the job, and Cohen agreed to pay him $300 for it. He further says that he was present when Greco was hired to murder Baff, and he gives a part of the negotiations between Greco and Cohen. A witness named Pearson testifies to other conversations with Cohen prior to the murder when Cohen said he was surprised that Baff was not killed long ago, and that he would get it some day.

As showing Cohen's state of mind immediately after the murder, a witness named Emerson says that within a few minutes he spoke to Cohen about it. If true, the incident shows at least great callousness on Cohen's part. A Mr. Marshall says that he saw Emerson and Cohen in conversation, and he testifies as to Cohen's actions. Rosenstein says that after the murder he heard Graff say to Cohen, " Joe, well we got him at last," and Cohen replied, " Don't tell me nothing about that now." Cohen testifies that he was not at the market until after the body had been removed, but Lowenstein testifies that he saw Cohen looking at the dead body as it lay in a stand in the market. Later Cohen stood seventy-five feet from the body in sight of the crowd about it.

For the defense we have the criticism of Cardinale's story that the murder was committed by two gunmen, neither of whom was Arichiello, but whose names he does not give. It is said that at one time, Arichiello confessed that he did the shooting; that Ferrara who drove the murder car, in the confession made by him, also stated that the shooting was done by Arichiello, and that his confession as to the details of the murder is entirely inconsistent with the story now told by himself and by Cardinale upon the stand. Further, that Ferrara's testimony on his own trial is equally inconsistent with the testimony now given by him. All this is true. Ferrara explains his confession as he explained it on his own trial by the claim that he was forced to give it by the police officials. An examination of the record shows that this is manifestly untrue. So far as his testimony in his own defense is concerned, that was equally

false, but that may be explained as an effort to escape the consequences of his crime. Why he made the confession he did, however, and why Arichiello made his confession is difficult to explain. And yet the statement now made by Ferrara and by by Cardinale that two men were driven to the market and that the murder was committed by those two men is consistent with the other evidence in the case. This difficulty, however, does not serve to relieve Cohen, except in so far as it reflects upon the general truthfulness of Cardinale and the weight to be given to his testimony.

There is also some criticism with regard to Cardinale's testimony as to the occurrences in the Werner loft, and the transactions there. Again this is important simply as bearing upon the general truthfulness of Cardinale, and the jury passed upon this question. The defendant called a large number of witnesses who said that his general reputation was good. The weight of this testimony, however, is lessened by the facts acknowledged by Cohen, himself, that he had been convicted when sixteen years old of an assault, and that later, when he attempted to be appointed on the police force of New York, he committed perjury.

An attack was made on Rosenstein's credibility. He was concededly a criminal. The witness Berka speaks of his expectation that if he pleaded guilty of manslaughter he would receive a suspended sentence. The witness Smith speaks of his admissions that he was framing up a charge against Cohen, although he knew him to be innocent, and the witness Zeigler says that he heard the same conversation. Smith, however, was an employee of Cohen, and Zeigler's corroboration is not persuasive. Fishel Cohen tells a similar story, and his story, also, in view of the cross-examination, seems doubtful. The witnesses Steuer, Helfstein, Krakauer and Fechtman say that Rosenstein's reputation was bad. Undoubtedly it was, but when they state that he was known as a strong arm man, it indicates that he was fitted for the part in the alleged conspiracy

which he is said to have played — that of holding up pursuit of the gunmen after the murder had been committed. It is to be noted also that his evidence against Cohen is brief; more so than seems consistent with an effort to frame up a charge against him. Aaron Newmark gave testimony tending to show that Cardinale was alone responsible for the fire. That was weakened on cross-examination, and it appears that in spite of the various crimes and outrages against him, for which he now seems to blame Cardinale, he never complained to the police.

The defendant's own story consisted in large part in the denial of all testimony tending to connect him in any way with the murder. As indicating the unlikelihood of relations between him and Rosenstein, he tells of a bitter quarrel. He says that Baff was one of his best customers, and, therefore, he would be unlikely to injure him. He says that he had only one talk with Sorro in Brooklyn, and denies that he told him he had made a collection of money to aid him in his defense. In this we have seen he is contradicted not only by Sorro, but by Romano. He says he never criticised Baff or his methods and action. This seems unlikely in view of all the other evidence in the case. He says he never looked over the stock of Cardinale & Jacobs before the latter entered into partnership. This also seems unlikely in view of his interest in the business of that firm. He admits that he never complained to the police with regard to Sorro's action on the bomb question, although he was wholly innocent of any connection with that transaction, and thought that Sorro was trying to frame up a charge against him, and although he knew that Baff's murder was still being investigated. He explains his inaction by the fact that he believed the district attorney was in the conspiracy against him. He admits receiving letters from Burke which he destroyed. He says they asked money for shoes for Burke's wife, though why Burke should write him he does not explain. Burke says they demanded pay for the bomb transaction. He denies the interview testified to by Cardinale at his own house in Brooklyn

where Cardinale claims he asked him for money for the gun-men, and he denies that he ever saw Cardinale at his house after the murder. Cardinale testifies that when he reached the house Mr. and Mrs. Jacobs and Mrs. Cohen were present, and that Cohen shortly afterwards came in. Cohen calls neither his own wife, nor Mrs. Jacobs to support this denial. On the whole the cross-examination of Cohen cannot be read without the feeling that it harms rather than helps the defense.

No fact can be proved to demonstration by any human testimony. The courts must need work with fallible instruments. The chance of error may be lessened by the number of witnesses or their character. It is always present. There is no absolute safeguard against mistake or perjury. A high degree of probability is all that we can expect. Not certainty, but reasonable certainty is the most we require. We must accept conditions as they exist. Criminals may tell the truth. If after weighing their story, in view of all the circumstances and all corroboration, it seems credible, we need not reject it merely because their reputation is bad or their habits vicious. Such facts are but a warning that caution should be used. For it is also to be remembered that in fixing the blame for such a crime as we are here considering the State is not likely to discover witnesses of high character. If a conspiracy in fact existed the Cardinales and the Sorros and the Grecos are the men to whom the conspirators would turn.

Viewing the evidence as a whole; making all allowance; using all proper caution, we believe that it presented a question which could only be solved by a jury. The responsibility for the result rests with it. By this statement we do not intend to criticize its action. The jurors saw the witnesses. The claims of the People and the defendant were presented to them with force and ability. Evidently they considered the case with care. Better than a court which reviews but the printed record are they fitted to pass upon the guilt or innocence of the accused.

It may not be said with justice that the defendant did not

have a fair and impartial trial. Some criticism is made as to the charge of the trial judge. It is claimed that it puts before the jury less clearly than it should the distinction between general corroboration of Cardinale's story and such corroboration of an accomplice as is required by the Code. Some disconnected sentences taken by themselves might be misleading. But the law as to such corroboration is correctely stated, and taking the charge as a whole it fairly presented the case to the jury, leaving to it the determination of all proper questions of fact.

It is also said that the closing address for the People was unfair; that it exalted the prosecution unduly; that it contained expressions of personal feeling on the part of the attorney-general, and that it raised issues outside of the evidence. The case had been long and involved. The interest of counsel in the result was undoubtedly keen, yet on reading the speech as a whole, it cannot be said that the attorney-general so far over-stepped the fair license allowed counsel in presenting their case and their views to a jury as to require reversal. There are various statements contained in the address as to what occurred between the attorney-general or the district attorney and one or more of the witnesses, which are, perhaps, not supported, yet these statements could not have worked substantial injury to the defendant. Many of the other statements criticised by the appellant were justified by the evidence or by inferences that might fairly be drawn from it. One such statement is that referring to the probability that various unnamed poultry merchants were interested in the conspiracy. A hint that such might be the fact appears at various times throughout the case. In addition, upon objections to the summing up being made, the court instructed the jury properly as to the weight to be given to the arguments of counsel.

As to alleged errors, the most serious relates to the corroboration required by section 399 of the Code of Criminal Procedure. No conviction may be had upon the testimony of an accomplice unless he is corroborated by such evidence as tends to connect

the defendant with the commission of the crime.   In his charge the court stated plainly that whatever relations he may have borne to the bomb transaction, or to the Newmark fire, Sorro was not an accomplice in the Baff murder.

The theory of the State is that in the spring of 1913, Cardinale, Cohen, Graff and others entered into a conspiracy to end by violence what they thought was Baff's unfair competition Lesser crimes failing they resolved to kill him and after various attempts succeeded on November 24, 1914.   During the course of this conspiracy and to accomplish this or that particular result agents were employed—Sorro, Burke, Greco, Rosenstein, Ferrara, the two gunmen.   The accomplices of whom section 399 speaks are those who joined in this general conspiracy and those who took part in the murder.   It does not necessarily follow that one who consented to place the bomb or to fire Newmark's market also took part in the killing of Baff.   If not he was not an accomplice in the crime of which Cohen was indicted.   His evidence as to Cohen's connection with that particular crime is not the evidence of an accomplice.

This was the position of Sorro when the conspirators resolved on murder.   Cardinale at Cohen's request began negotiations with Greco, but there was dissatisfaction as to the price offered. Finally, Cardinale states that the defendant determined to see Greco himself and a conference took place at Cardinale & Jacobs' market.   Cardinale, the defendant, Jacob Cohen and David Jacobs met there.   Cardinale had already asked Sorro to commit the murder but Sorro had refused.   While the four men were in the market Sorro was sent to bring Greco.   It does not appear that Sorro knew why the four men met or the purpose for which they wished Greco.   When Greco came, Sorro was present for a time but took no part in the conversation.   He heard the defendant say he was willing to pay $500 to have Baff killed and he heard Greco's answer, but he did not hear the price finally agreed upon.   Later he seems to have heard

from Cardinale that the murder plot had begun and that the conspirators were actually at work upon plans to kill Baff.

Neither his presence at the market and his knowledge of the conversation there, since he took no part in the murder conspiracy, itself, nor his later knowledge that certain persons were engaged in such a conspiracy made him an accomplice. "To constitute an accomplice one must be so connected with the crime that at common law he might himself have been convicted either as the principal or as an accessory before the fact. To warrant such a conviction the one accused must have taken part in the perpetration of, or preparation for, the crime, with intent to assist in the crime." (People v. Zucker, 20 App. Div. 363, 365, 14 N. Y. Crim. 464, affd., 154 N. Y. 770.) To make one an accomplice, "enough must be shown to justify the inference that the offender has counseled or induced or encouraged the crime. * * * In this testimony we can find no evidence that would stamp Levinson as an accomplice. He receded from the conspiracy, and the crime was committed without him. To permit a jury to say that he did join in it, when the only evidence is that he did not, would be to permit them to build their verdict upon speculation and suspicion. Levinson, by his own confession, had committed many other crimes. But he did not commit this crime, either in person or by procurement." (People v. Swersky, 216 N. Y. 471, 476.)

The charge being right that as a matter of law Sorro was not an accomplice so far as the murder was concerned, the next question is whether there was sufficient corroboration under section 399. "It is not necessary that the corroborative evidence of itself should be sufficient to show the commisison of the crime or to connect the defendant with it; nor need such evidence be wholly inconsistent with the defendant's innocence; it is sufficient if there is some evidence fairly tending to connect the defendant with the commission of the crime; and it is then for the jury to determine whether the corroboration is sufficient to satisfy the jury of the defendant's guilt." (People v. Elliott,

106 N. Y. 288, 7 N. Y. Crim. 126.)   The statute does not require that the whole case should be proved outside of the testimony of the accomplice, but simply requires evidence from an independent source of some material fact tending to show not only that a crime has been committed but that the defendant was implicated in it.   (People v. Hooghkerk, 96 N. Y. 149.)

What is required is corroboration of the statement that Cohen instigated the killing.   We think that the review of the case given above, including Cohen's own statements and denials, shows that there is ample evidence of this kind tending to corroborate Cardinale.   (People v. Becker, 215 N. Y. 126, 140, 33 N. Y. Crim. 93.)

Cardinale testified that becoming impatient at the delay of Greco in killing Baff, he, with Cohen's knowledge, engaged two gunmen to commit murder, and that they were the two men who finally succeeded.   In answer to the court's questions, he refused to give the residence of these two men or to give a reason for his refusal.   He was asked by the attorney-general to give a talk which he had had with them.   The counsel for the defendant then said that if the witness would not answer the court's question he objected.   The court overruled the objection, saying " we will see about that later."   On cross-examination Cardinale again refused to give the names of the gunmen, saying that it would incriminate him.   This evidently was not his true reason.   There were, also, other refusals by him to give the names, but the counsel for the defendant seems to have made no serious effort to obtain them.   Nothing further was done about the matter until the close of the trial some four weeks thereafter.   At that time the defendant moved that the court compel the attendance of the witness Cardinale and direct him to answer the questions which he refused to answer in response to the court and in response to the defendant's counsel.   And the defendant's counsel said that he had withheld the motion in order that all the testimony might be in so that he might see the bearing of it all.   The court denied the motion and the defend-

ant's counsel asked to strike out all of Cardinale's testimony. That motion was also denied.

We do not think that this action on the part of the court constituted error or was an abuse of its discretion. It might well be that an astute trial counsel might expect greater advantage before a jury by a refusal of Cardinale to answer these questions than by an answer forced from him. A request to charge gives some support to this view. Such an idea, however, was disclaimed by Mr. Moss on the argument before us and we accept his disclaimer. But it was the duty of the defendant's counsel, if he thought the evidence important for his client, to ask the court to require the witness to answer. If that had been done either the answer would have been obtained, or if there was still a refusal, proper steps might have been taken to compel the witness to comply with the order of the court. It was not fair either to the court or to the prosecution to wait for four weeks so that the counsel might, as he says, see the bearing of all the testimony, and then decide whether or not to require an answer of the witness. The question was one for decision one way or the other when the witness was upon the stand or within a reasonable time thereafter, and there is nothing in the alleged promise of the court to justify the action of the defendant.

In summing up to the jury counsel for the defense had stated that the defendants were guilty either of murder in the first degree or were innocent. This is often done on behalf of the defendant in trials for murder with the idea of impressing the jury with the gravity of their duties and wringing from them a verdict of acquittal as against a verdict requiring the death penalty. In this case, however, no such purpose need be imputed to the defendant's counsel. He saw as we all must that where the charge is that certain persons hired others to commit murder, and those others did commit it with premeditation and deliberation, their masters, necessarily, are guilty of the same crime. Under such circumstances the only logical verdict would be murder in the first degree. Thereafter, when the court came to its

charge, it said that it was unnecessary to define deliberation and premeditation because of the statement made by the counsel of the defense in his summing up. If the defendants were concerned in the murder they were guilty of murder in the first degree, and if they were not concerned in it they should be acquitted. But as a precaution he asked the counsel of the defendnat if that was his attitude and received as answer that it was.

The defendant now says that under section 444 of the Code of Criminal Procedure, upon indictment for a crime consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the indictment and guilty of any degree inferior thereto or of an attempt to commit a crime. We may assume, without so deciding, that even in a case such as the one before us this is true; that the jury has the physical right to exercise this power in all cases where the indictment charges actual murder, and where intent is an element of the crime; that the court is bound to make such a charge on the request of the defendant's counsel. But it certainly is not true where the defendant has taken such a position as was taken by him here. If he does he cannot be heard to complain if the charge is omitted. He cannot have the advantage of obtaining the pity of the jury by statements that unless they acquit they must convict him of murder in the first degree, and at the same time expect the court to adopt an inconsistent attitude. He cannot emphasize this position when questioned by the court and then later claim that the jury should have been informed that they had it in their power to bring in a verdict for a lesser degree of the same crime. (Buel v. People, 78 N. Y. 492; People v. Monat, 200 N. Y. 308, 312, 25 N. Y. Crim. 309.)

Complaint is made that the verdict of the jury is illogical, in that while it convicted the defendant of murder in the first degree, it convicted Graff, a co-defendant, who if guilty at all, was equally guilty with Cohen, only of manslaughter in the first degree. That the jury failed to do their duty towards Graff is

no reason for reversing the verdict which they found against Cohen. Why they made the distinction in favor of Graff we do not know. It cannot be explained upon the record. The jury saw the two men, however, and it is possible that something in Graff's attitude or condition may have inclined it to mercy in his case. Juries do forget, at times, that the question of mercy is something with which they should have no concern. (People v. Kief, 126 N. Y. 661.)

People v. Munroe (190 N. Y. 435, 22 N. Y. Crim. 1), cited by the appellant, is not in point. There, if one defendant was acquitted, it was legally impossible · that the other could be guilty. Here, however erroneous the action of the jury so far as Graff was concerned, no such condition exists.

After the verdict against Cohen had been received and before the verdict against Graff, the court did charge the jury as to the different degrees of homicide. It is said the court should then have directed the jury to reconsider their verdict against Cohen under section 447 of the Code of Criminal Procedure. But why? That section refers to cases where the court believes the jury have mistaken the law. They had not done so. If guilty at all, they had properly applied the law as to Cohen.

As has been said, four men were tried together for the murder of Baff. After the jury had retired it returned to the court and the following proceedings were had: The court said, " Now, gentlemen and counsel, the jurors have sent this request. Some of the jurors have the opinion that they can find a verdict of a lesser degree than murder in the first degree against some of the defendants; is such the law? And just now I received this further written notice from the foreman: ' The jurors have agreed on a verdict concerning three of the defendants but are unable to agree on the fourth yet.' Gentlemen of the jury, if you have agreed as to any of the defendants, you may announce your verdict as to those three."

" The Clerk: Have you agreed upon a verdict, gentlemen? "

" The Foreman: Yes, we find as to three of them as follows:

We find Jacob Cohen not guilty. We find David Jacobs not guilty. We find Joseph Cohen guilty of murder in the first degree as charged."

The court then told the jury it might find the defendant Graff guilty of a lesser degree of homicide than murder in the first degree and it proceeded to define murder and manslaughter. The jury again retired. The court discharged David Jacobs and Jacob Cohen and remanded Joseph Cohen for sentence. Later the jury returned to the court with a verdict of manslaughter in the first degree against Abraham Graff and the court discharged it.

It is said that this proceeding was irregular. It must be conceded, we think, that it was unusual. And yet in conspiracy trials there are instances where at the close of the People's case the jury has been recommended to acquit certain defendants, and after it has done so, the trial has proceeded against the others. Under the old rules of evidence such action might be necessary to prevent injustice. (State v. Bogue, 31 N. C. 360.) The proceedings with regard to verdicts are found in sections 433 to 454 of the Code of Criminal Procedure. Section 466 provides that on an indictment against one or more, if the jury cannot agree on a verdict as to all, it may render a verdict against those in regard to whom it does agree, on which a judgment must be entered accordingly, and the case as to the rest may be tried by another jury. Section 451 provides that when the verdict is given the jury must be discharged from the case.

There being no express provision against it, we know of no reason why the practice adopted in this case was not proper. The consideration of the guilt of the defendants was distinctly left to the jury as a separate matter. Why, if it came to an early determination as to one, the verdict as to that one might not be rendered, and why he was harmed by such action it is difficult to see. If the jury had come in finally with a verdict as to all the defendants, the result would have been in precisely the same form as here. Reading the Code fairly the verdict

after which the jury was discharged in this case is the last verdict which finally determines the guilt or innocence of all of the defendants.   Even if that were not so, even if the jury must be held to have been discharged before they reached the verdict against Graff, the defendant Cohen has no cause for complaint.

Further, as pointed out by the respondent, there is another consideration.   A jury reports that it has agreed to render a verdict of not guilty as to one of two defendants and has not agreed as to the other.   The court refuses to accept it until a decision is reached as to both.   May the jury then reconsider and convict both?   (Code, § 447.)

It is said that there is no evidence in the case which would justify the jury in finding that Baff was killed by gunmen named Dragnia or Tita, or any evidence of a connection between Cohen and the men who did the shooting, even assuming that such a conspiracy existed as the People claim.   In that, we think, the appellant is mistaken.   There is evidence to justify the jury in finding that Baff was shot by two gunmen driven to the market by Ferrara, and that these gunmen were the agents of Cardinale, who, in turn, was the agent of Cohen.

The record contains many exceptions to the admission or rejection of testimony.   We have examined them all, and we have reached the conclusion either that the rulings were right or that where wrong they may be disregarded under section 542 of the Code.   It may be remarked, generally, that there seems to have been no dispute that the various crimes, beginning with the bomb outrage, were actually committed.   There is no dispute but what Baff was actually murdered.   The sole question before us is as to Cohen's connection with this murder.   Only in regard to this matter and in so far as it directly affects Cohen is an error important.

The judgment of conviction should be affirmed.

CHASE, CARDOZO, POUND, McLAUGHLIN and CRANE, JJ., concur; HOGAN, J., dissents.

Judgment of conviction affirmed.