[879 NYS2d 74]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v UM-
BERTO FERNANDEZ, Appellant.

First Department, May 7, 2009

APPEARANCES OF COUNSEL

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Daniel A. Warshawsky* and *Jessica A. Yager* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney*, New York City (*Dennis Rambaud* and *Gina Mignola* of counsel), for respondent.

## OPINION OF THE COURT

McGUIRE, J.

In reversing the defendant's conviction in *Morissette v United States* (342 US 246 [1952]), Justice Jackson stated for a unanimous Supreme Court that "[t]his would have remained a profoundly insignificant case to all except its immediate parties had it not been so tried and submitted to the jury as to raise questions both fundamental and far-reaching in federal criminal law" (*id.* at 247). We conclude that essentially the same fundamental error was made in this case when defendant's request that criminally negligent homicide be submitted to the jury was denied.

The uncontroverted evidence at trial established that the victim, Luis Gomez, died as a result of a single stab wound to the left side of his chest that was some three to four inches deep and penetrated his aorta by three eighths of an inch. The undisputed proof also established that defendant caused that wound while wielding a large knife, one with a $10^1/_2$-inch serrated blade, that he obtained from the kitchen in his apartment after an earlier altercation with Gomez during which Gomez punched him in the nose. Defendant was charged in a single-count indictment with second-degree manslaughter (Penal Law § 125.15 [1]) for recklessly causing Gomez' death. Thus, the People contended that in wielding the knife and inflicting the fatal wound, defendant was "aware of and consciously disregard[ed] a substantial and unjustifiable risk that [death would] occur" (Penal Law § 15.05 [3]). After a jury trial, defendant was convicted of that crime. On appeal, he contends that the trial court erred in denying his request for the submission of a charge of criminally negligent homicide (Penal Law § 125.10) as a lesser included offense of the second-degree manslaughter charge. In relevant part, the elements of the two offenses differ solely with respect to the requisite mens rea, with criminally negligent

homicide requiring proof that in wielding the knife and inflicting the fatal wound, defendant "fail[ed] to perceive a substantial and unjustifiable risk that [death would] occur" (Penal Law § 15.05 [4]).[1]

The propriety of the denial of a request for the submission of a lesser included offense turns on "whether, under any reasonable view of the evidence, it is possible for the trier of facts to acquit defendant on the higher count and still find him guilty of the lesser one" (*People v Van Norstrand*, 85 NY2d 131, 136 [1995]). "In determining whether such a reasonable view exists, the evidence must be viewed in the light most favorable to defendant" (*People v Martin*, 59 NY2d 704, 705 [1983]). Accordingly, "it is well settled that a refusal to charge a lesser included crime is warranted only where every possible hypothesis but guilt of the higher crime [is] excluded" (*People v Johnson*, 45 NY2d 546, 549 [1978] [internal quotation marks omitted; brackets in original]). Moreover, "the jury's freedom to accept or reject part or all of the defense or prosecution's evidence" is "[e]qually well established" (*id.* [internal quotation marks omitted]).

Because the sole relevant difference between the crimes of reckless manslaughter and criminally negligent homicide is the mens rea of the actor, another settled principle of law is highly relevant to the resolution of this appeal. In *People v Flack* (125 NY 324 [1891]), Judge Andrews addressed the respective roles of the jury and the judge on the issue of criminal intent. Sixty years later, in *Morissette*, Justice Jackson quoted Judge Andrews' "well stated" (342 US at 274) words at length. Judge Andrews wrote:

> "However clear the proof may be, or however incontrovertible [*sic*] may seem to the judge to be the

---

**1.** Under the statutory definition of the term "lesser included offense" (CPL 1.20 [37]), a lesser offense is a lesser included offense of a greater offense only when it is "theoretically impossible to commit the greater crime without at the same time committing the lesser" (*People v Glover*, 57 NY2d 61, 64 [1982]). Under this test, criminally negligent homicide is a lesser included offense of reckless manslaughter only if it is impossible to be "aware of and consciously disregard[ ]" a risk of death without at the same time "fail[ing] to perceive" that risk. Obviously, just the opposite is the case. A person who acts while aware of and consciously disregarding a risk of death *cannot* simultaneously fail to perceive that risk. Nonetheless, the Court of Appeals has made clear that criminally negligent homicide is a lesser included offense of reckless manslaughter (*People v Green*, 56 NY2d 427, 432 [1982]; *see also People v Heide*, 84 NY2d 943, 944 [1994]).

inference of a criminal intention, the question of intent can never be ruled as a question of law, but must always be submitted to the jury. Jurors may be perverse; the ends of justice may be defeated by unrighteous verdicts, but so long as the functions of the judge and jury are distinct, the one responding to the law, the other to the facts, neither can invade the province of the other without destroying the significance of trial by court and jury" (*People v Flack*, 125 NY at 334).

What is true of the specific mens rea of criminal intent is true of mens rea generally: it is quintessentially a question for the jury.

Judge Andrews' statement of the law is not inconsistent with the settled principle that a lesser included offense may be submitted only when there is a reasonable view of the evidence that the defendant committed the lesser but not the greater crime. When the only relevant difference between the greater and lesser crime is the required mens rea, "the question of intent," or mens rea generally, can be ruled as a question of law and need not be submitted to the jury when there is no such reasonable view. Judge Andrews' statement of the law is not to the contrary, as in the two sentences immediately preceding those quoted above he spoke of the "general rule of law" and acknowledged the existence of "exceptional cases" (125 NY at 334). The crux of the position staked out for the Court by Judge Andrews is that, given the distinct role and competence of the jury on the factual question of mens rea, judges must be particularly chary about invading the province of the jury by ruling on mens rea as a matter of law. As discussed below, this principle of deference to the jury on questions of mens rea is not an anachronism.

Mens rea is the particular province of the jury because it is elusive as well as subjective, and all but invariably is determined by drawing from objective facts—which may be inconsistent, fraught with ambiguity or both—inferences about a subjective matter that are informed by human experience. As Chief Judge Cardozo stated for a unanimous Court of Appeals in reversing a conviction for murder in the first degree because of the trial court's refusal to submit lesser homicide charges: "Whenever intent becomes material, its quality or persistence—the deranging influence of fear or sudden impulse or feebleness of mind or will—is matter for the jury if such emotions or disabilities can

conceivably have affected the thought or purpose of the actor" (*People v Moran*, 246 NY 100, 103 [1927]).The common sense inherent in Chief Judge Cardozo's observation is manifest, and is reflected in the colloquial expression that a person was "out of his mind" with anger or fear. That commonsense, albeit not literal, truth is one the criminal law has been mindful of in asking juries to look *into* the mind of the accused.

This principle of judicial deference with respect to mens rea was reaffirmed by the Court of Appeals 55 years later in *People v Butler* (57 NY2d 664 [1982]) when the Court reversed a panel of this Court that had concluded that a charge of first-degree manslaughter should not have been submitted to the jury at the prosecution's request as a lesser included offense of an intentional murder count (86 AD2d 811 [1982]). In reversing on the dissenting memorandum of Justice Sandler (*id.* at 812), the Court embraced Justice Sandler's view that the above-quoted statement by Chief Judge Cardozo was "the definitive comment on the essential issue presented" (*id.* at 815), i.e., whether the jury properly was permitted to determine whether the defendant had acted with a less culpable mens rea (*see also People v Martin, supra*; *People v Lee*, 35 NY2d 826 [1974]). As is clear from *People v Butler*, moreover, this principle of judicial deference is not one that operates only to benefit defendants (*see also People v Mussenden*, 308 NY 558, 562 [1955] [noting that the submission of lesser offenses than those charged in the indictment was "originally 'intended merely to prevent the prosecution from failing where some element of the crime charged was not made out' " (quoting *People v Murch*, 263 NY 285, 291 [1934])]).

Defendant, who was 53 years old at the time of trial, testified that upon returning to his apartment building from his job at a restaurant in the early morning of December 21, 2005, he encountered Mr. Gomez and another man, Michael Fernandez, as he was about to enter the building. Defendant had had a problem with Gomez on a prior occasion, after which Gomez started looking at him the "wrong way." According to defendant, he first saw Gomez, who was 22 years old at the time of his death, when the latter was about 15 years old. After not seeing him for "a while," defendant then saw Gomez "a lot" as he "use[d] to go in and out of the building a lot and he used to do wrong things." Although defendant testified both about the prior problem he had with Gomez and the "wrong things," the details are not important.

As defendant was entering the vestibule of his building on December 21, Gomez stood in front of him and insulted him, using an expletive. After defendant said that he was going to take "the bad word" as a joke, Gomez took "something," a "piece of metal," out of his pocket and punched defendant in the face.[2] Defendant went into his building bleeding "a lot" from his nose; when he touched his nose he could hear a noise. Without looking back, he went upstairs to his apartment. Defendant washed up in the bathroom and removed his bloody shirt. He was in "a lot of pain," and because "the blood didn't stop" he "didn't have enough strength anymore." He went into the kitchen and grabbed a knife from an open cabinet. Defendant's sister, Clara Fernandez, who had awoken, did not want him to go back downstairs and tried to stop him. Ms. Fernandez testified that defendant was "bleeding a lot," his face was "totally swollen," he was not "coordinating well" and was "confused." However, defendant concealed the knife under his coat and went back downstairs. According to defendant, his purpose in going back was "since I know the guy I wanted from him at least to say I'm sorry to me." He brought the knife with him for his own protection, "because that group was very tough and dangerous," but "not to do harm to anyone."[3]

With respect to the issue upon which this appeal turns, the most critical testimony defendant gave concerned the events that occurred as he was about to exit the building. According to defendant, Gomez and Michael Fernandez stopped him, blocking him from leaving. With the knife still concealed under his coat, defendant twice asked Gomez why he had hit him. In response, Gomez "started making fun, he was laughing." According to defendant, Gomez then "went to attack me again." Specifically, Gomez "loosened his jacket like a boxer," raised his hands and "went to lunge at me with his hand."[4] Although Go-

---

**2.** Defendant expressly testified that the object was "brass knuckles." In a written statement he gave to a detective, however, he stated that he was not sure whether he was "hit with a fist or an object."

**3.** The jury heard other relevant evidence from defendant about his intentions in going back downstairs. As discussed below, however, none of the evidence about defendant's intentions in going back downstairs is dispositive of defendant's mental state—i.e., whether he was aware of and consciously disregarded a substantial and unjustifiable risk of death or instead failed to perceive such a risk—when he actually did go downstairs and pulled out the knife upon being confronted by Gomez.

**4.** Defendant also testified that when Gomez swung at him, Gomez "was in front here to the side and he went like this with all his body, then I lunged

(n. cont'd)

mez moved both of his arms, he moved his left arm more. Gomez' left hand was clenched into a fist. He did not have the brass knuckles in his left hand, and defendant did not know whether he had them in his right hand, which was not the one he used to "lunge" at defendant.

When Gomez raised his hands, defendant pulled out the knife and "quickly . . . lunged at his hand." As defendant so testified, the prosecutor stated that defendant was indicating that defendant used his left arm to lunge at Gomez' hand. The trial court then stated that defendant had been swinging his arm at shoulder level and described the motion as a "roundhouse." For his part, defendant's attorney stated without contradiction that "the witness is indicating not straight out but around." According to defendant, the knife "unfortunately . . . did not hit the hand and I felt I scratched his jacket." After "lunging" with the knife in this fashion at Gomez' left hand and missing, Gomez and Michael Fernandez "took off running from in between the two doors." In a statement he made to a detective following his arrest that morning, defendant repeatedly stated, consistent with his trial testimony, that after pulling out the knife when Gomez moved his hands and body to strike him, defendant "lunged at his hand" with the knife.

If the jury credited the foregoing testimony—for the reasons stated below, we are obligated to conclude that it could have—the jury reasonably could have concluded that in lunging at Gomez' hand, defendant "fail[ed] to perceive" that in attempting to strike Gomez' hand, his conduct created "a substantial and unjustifiable risk that [death would] occur" (Penal Law § 15.05 [4]). As the Court of Appeals stated in *People v Heide* (84 NY2d at 944) in affirming the Appellate Division's holding that the trial court properly submitted a charge of criminally negligent homicide as a lesser included offense, "the fact that defendant intentionally stabbed [the decedent] does not preclude a finding that defendant committed criminally negligent homicide." As is clear from the dissenting opinion in the Appellate Division, as in this case the decedent was stabbed once, not repeatedly (206 AD2d 875, 875 [1994]). Moreover, unlike this case, Heide "testified that he intentionally stabbed the victim in the groin with [the] knife" (*id.*).

In other respects, the facts of this case provide more support for the submission of criminally negligent homicide than those

at his hand." The movement defendant thus indicated, however, is not described in the transcript.

of *Heide*. Defendant was not, unlike Heide, the initial aggressor in the fatal stabbing (206 AD2d at 875); Heide did not, unlike defendant, wield the knife in an immediate response to what he perceived to be an imminent attack against him. Rather, Heide "intentionally stabbed the victim . . . so that he would release his grip on [him]" (*id.*). By contrast, when Gomez raised his hands as if to strike defendant again, defendant pulled out the knife and "quickly . . . lunged at his hand." Because a reflexive action is an unthinking action, surely a jury reasonably could have concluded that defendant was not "aware of and consciously disregard[ing] a substantial and unjustifiable risk that [death would] occur." The relevant part of Chief Judge Cardozo's eloquent statement of the key legal principle and the matters of common experience underlying it bears repetition: "[w]henever intent becomes material, its quality or persistence—the deranging influence of fear or sudden impulse . . .— is matter for the jury if such emotions . . . can conceivably have affected the thought or purpose of the actor" (*People v Moran*, 246 NY at 103).

Apart from the reflexive or sudden nature of the fatal act and the reasonable inference that it was borne of fear, the jury heard defendant's sister's testimony that defendant was "confused" and "not coordinating well." In addition, the jury heard defendant's testimony that he was "all tormented in pain" and his statements to the detective to the effect that he had begun to "panic" from losing so much blood and thought he was going to die.

Finally, there is an additional evidentiary basis from which the jury reasonably could have concluded that defendant indeed was trying to strike only at Gomez' hand and unintentionally stabbed him in the chest. That is, defendant not only testified that Gomez was moving both his hands as he prepared to attack, defendant also described, as noted above, a movement Gomez made at the same time "with all of his body" as defendant "lunged at his hand." For all of these reasons, and because the mens rea elements of the crimes of reckless manslaughter and criminally negligent homicide are "but shades apart on the scale of criminal culpability" (*People v Stanfield*, 36 NY2d 467, 471 [1975]), criminally negligent homicide should have been submitted to the jury.

Of course, particularly given the other evidence at trial, a jury reasonably could have concluded that defendant was "aware of and consciously disregard[ed] a substantial and unjustifiable

risk that [death would] occur" (Penal Law § 15.05 [3]). But as Judge Fuld stated in explaining the scope of a defendant's right to the submission of a lesser offense, "it does not matter how strongly the evidence points to guilt of the crime charged in the indictment, or how unreasonable it would be, as a court may appraise the weight of the evidence, to acquit of that crime and convict of the less serious" (*People v Mussenden*, 308 NY at 562; *see also People v Van Norstrand*, 85 NY2d at 136 ["(o)ur inquiry is not directed at whether persuasive evidence of guilt of the greater crime exists, as it does here, but whether, under any reasonable view of the evidence, it is possible for the trier of facts to acquit defendant on the higher count and still find him guilty of the lesser one"]; *Morissette*, 342 US 246 [1952] [reversing criminal conviction because the "court refused to submit or to allow counsel to argue to the jury whether Morrissette acted with innocent intention" (*id.* at 249), and observing that "juries are not bound by what seems inescapable logic to judges" (*id.* at 276)]). For the same reason, and because the jury may not have credited it (*People v Johnson*, 45 NY2d at 549), the testimony of the prosecution's principal witness, Michael Fernandez, does not warrant denial of defendant's request that the jury consider a charge of criminally negligent homicide even though it "strongly . . . points to guilt of the crime charged" (*Mussenden*, 308 NY at 562).

That we are obligated to conclude that the jury could have credited defendant's testimony is clear. At least where, as here, the defendant testifies and no incontrovertible evidence conclusively refutes the defendant's testimony, that obligation is a corollary of our fundamental obligation to view the evidence in the light most favorable to the defendant. It is supported as well by a basic reality of trials: whether a jury determines to credit the testimony of a defendant (or any witness) is in part a function of the demeanor of the defendant. Ninety years ago, Judge Andrews elegantly drove home the point for appellate courts:

> "The jurors saw the witnesses. The claims of the People and the defendant were presented to them with force and ability. Evidently they considered the case with care. Better than a court which reviews but the printed record are they fitted to pass upon the guilt or innocence of the accused" (*People v Cohen*, 223 NY 406, 423 [1918]).

Albeit in a different context, the Court of Appeals more recently made essentially the same point in *People v Sloan* (79

NY2d 386 [1992]). The Court held that defendants have a right to be present during sidebar questioning of prospective jurors relating to "attitudes and feelings concerning some of the events and witnesses involved in the very case to be heard" (*id.* at 392). The key to the Court's analysis was that the

> "[d]efendants' presence at the questioning on such matters and the resultant opportunity for them to assess the jurors' facial expressions, demeanor and other subliminal responses as well as the manner and tone of their verbal replies so as to detect any indication of bias or hostility, could . . . be[ ] critical in making proper determinations in the important and sensitive matters relating to challenges for cause and peremptories" (*id.*).

These same factors are at least as critical to the ability of juries to "mak[e] proper determinations in the important and sensitive matter[ ] relating to" the credibility of testimony by defendants. On this score, finally, there is the obvious point made by Judge Andrews in *People v Cohen*: "Criminals may tell the truth" (223 NY at 422).

To be sure, as noted above, the jury heard other significant evidence bearing on defendant's intentions in grabbing the knife and going back downstairs. As defendant conceded on cross-examination, he told the detective that while he was still in the apartment he thought to himself that "[i]f I'm going to die, I am at least going to scar the person who killed me" and that his intent was not to kill but to wound. And defendant also conceded he had told the detective that while still in the apartment he thought to himself, "[i]f I don't do something now they are going to do this every day."

The probative force of this testimony depends in large part on the inference—which certainly is not unreasonable—that the intention of scarring, wounding or "do[ing] something" persisted when defendant actually did go downstairs and encountered Gomez anew. That inference, however, is not ineluctable. To quote yet again Chief Judge Cardozo's words, "[w]henever intent becomes material, its quality or *persistence* . . . is matter for the jury" (*People v Moran*, 246 NY at 103 [emphasis added]). In short, mens rea can be ephemeral as well as elusive.

Moreover, that same statement to the detective gave the jury a basis for concluding that defendant's intentions had changed when he got downstairs. That is, as defendant also acknowledged

on cross-examination, he told the detective that when he saw Gomez and asked him why he had hit him, he was "thinking that if the guy said, 'I'm sorry,' I would leave it alone and go back upstairs." Three other points should be underscored. First, whatever defendant's intentions may have been while in the apartment and when he first encountered Gomez again, the jury reasonably could have concluded that once Gomez acted to strike him again, defendant acted unthinkingly, without perceiving that he was creating any, let alone a substantial, risk of death in lunging once with the knife. Second, when he testified, consistently with his statement to the detective, that he lunged at Gomez trying to strike his hand, defendant's demeanor could have been such as to lead the jury to find that testimony credible (*People v Cohen*, 223 NY at 422). Third, the persuasiveness of arguments based on defendant's statements to the detective about intending to scar or wound are irrelevant as it does not matter how strongly the evidence may support the conclusion that defendant was aware of and consciously disregarded such a risk of death (*People v Mussenden*, 308 NY at 562; *People v Van Norstrand*, 85 NY2d at 136).

Accordingly, the judgment of Supreme Court, New York County (Carol Berkman, J.), rendered November 17, 2006, convicting defendant, after a jury trial, of manslaughter in the second degree, and sentencing him to a term of 5 to 15 years, should be reversed, on the law, and the matter remanded to Supreme Court for a new trial.

GONZALEZ, P.J., TOM, SAXE and FRIEDMAN, JJ. concur.

Judgment, Supreme Court, New York County, rendered November 17, 2006, reversed, on the law, and the matter remanded for a new trial.