THE PEOPLE OF THE STATE OF NEW YORK *v.* JOSEPH COHEN.

(Supreme Court, New York Special Term, November, 1921.)

Criminal procedure — murder — evidence — weight to be given recantation of witness — newly discovered evidence — effect of conviction of recanting witness for perjury— accomplice — necessity of corroboration — conflicting statements — when court need not hear witnesses orally upon motion for new trial — new trial granted because of false testimony of principal witness for prosecution — Code Crim. Pro. § 465(7).

After an important witness for the prosecution in a capital case had recanted, the sentence imposed upon defendant was commuted to imprisonment for life. At the time of the argument of a motion for a new trial on the ground of newly discovered evidence, to wit, that the recanting witness had committed perjury on the trial of defendant, said witness was awaiting trial under an indictment charging him with such perjury. *Held,* that if the court was satisfied that the recantation of the witness was not of such weight as to require the

granting of the motion for a new trial, it was its duty to disregard the verdict of the jury convicting said witness of perjury in the giving of his testimony on the trial of defendant.

Upon consideration of the records on the trial of defendant and on the trial for perjury, *held,* that the testimony given by the recanting witness on the trial of defendant was of such basic importance as to require the court to grant the motion for a new trial, it appearing that the preponderance of evidence, considered apart from the conviction of the recanting witness for perjury, shows that he did commit perjury against those charged with the murder; the perjury need not be established beyond reasonable doubt.

Where the record discloses that witnesses have already been examined, the court is not called upon to hear them orally as it might under section 465(7) of the Code of Criminal Procedure.

The possible reversal of the judgment convicting the recanting witness of perjury on the trial of defendant has no bearing upon the motion for a new trial, need not be considered, and the motion will be granted.

MOTION for new trial after conviction for murder.

Goldstein & Goldstein, by Jonah J. Goldstein, for the application.

Charles D. Newton, attorney-general, by Alfred L. Becker, opposed.

GAVEGAN, J. This is a motion for a new trial of Joseph Cohen, who was tried in June and July, 1917, for the murder of Barnett Baff on November 24, 1914. He was convicted and sentenced to be executed. He obtained several respites, and after the recantation of Sorro, a witness at his trial, and a very extensive inquiry, conducted before a judge of the Court of General Sessions sitting as a magistrate, his sentence was commuted to life imprisonment.

The application for a new trial is made on the well recognized ground of newly discovered evidence, the

Supreme Court, November, 1921.     [Vol. 117.

newly discovered evidence in this case being that of the perjury alleged to have been committed by Sorro in his testimony at the trial of Cohen. On the argument of the motion, which took place while Sorro was awaiting trial under the indictment charging him with such perjury, I announced that decision would be reserved pending the outcome of Sorro's trial.

Now that Sorro has been convicted, the People of the State of New York virtually join in the application, the attorney-general consenting that it be granted, but on a novel and impracticable condition. The condition or suggestion is that the court retain jurisdiction to annul its determination if there be an appeal and a reversal of Sorro's conviction. The value of the suggestion, were such a conditional determination possible, depends upon the bearing that a reversal of that conviction would have upon the substantial merits of the application. This will be considered below.

Commendable as the action of the attorney-general is in freely admitting that Sorro's testimony was of sufficient importance to require the court to grant Cohen a new trial, so long as it remains legally established that such testimony was false and perjured, the responsibility for the disposition of the application nevertheless falls on the court alone. This would be no light burden in any murder case. But the circumstances leading up to and surrounding the murder of Barnett Baff, which were revealed only after years of inquiry, as well as the place and manner of its perpetration, which displayed the most brutal and atrocious disregard of human life and of the interests of the state in the maintenance of law and order, made the apprehension and conviction of all responsible for it a matter of the gravest public concern. Furthermore, this feeling of responsibility is enhanced by the

unsatisfactory showing that Cohen made as a witness for the defense at the trial of himself and others charged with procuring the murder, hereinafter referred to as the Cohen trial. The impression made by his own testimony is so unfavorable as to predispose the court against granting Cohen anything more than he is unquestionably entitled to receive.

" Evidence of recantation on the part of a witness is newly discovered evidence, and therefore of a character which would justify granting a new trial; but it cannot be said, as a matter of law, that a new trial should be granted whenever an important witness against the defendant shall make an affidavit that he committed perjury in his testimony, since there is no form of proof so unreliable as recanting testimony. The question in such case is whether the evidence of recantation which is presented is of such a character and weight as to justify this court in setting aside the judgment entered upon the verdict of the jury." *People* v. *Shilitano,* 218 N. Y. 161, syllabus.

In a sense Sorro's perjury against Cohen has been established in Cohen's favor by the verdict of the jury at Sorro's trial. But I do not consider that verdict as binding on me in this application. Though it may not be lightly disregarded, it would be my duty to disregard it if, from my own investigation, I should become satisfied that the recantation of Sorro was not of such weight as to require me to grant the relief sought.

However, the application may not be denied because the evidence is not of such character and weight as to convince this court beyond a reasonable doubt that Sorro had committed perjury at the trial of Cohen. " Obviously, where the solemn judgment of a court is attacked and set aside, the burden of proof rests upon him who attacks it, and while, perhaps, he

**11**

should not be required to prove his case beyond a reasonable doubt, he should prove it by preponderance of evidence.'' *People* v. *Giordano,* 106 Misc. Rep. 235, 238.

The jury which convicted Sorro were convinced, and rightly, as I believe, beyond a reasonable doubt that he had committed perjury in his testimony at the Cohen trial. While that was the test to which they had to subject the evidence against Sorro, it does not point out the test to be applied here. I am to consider the evidence of the recantation, including all the circumstances relating to it, those in the case against Cohen, those in the case against Sorro and the surrounding circumstances. Thus the weight to be accorded to the recantation is to be determined. Is it entitled to little or no weight because it is merely a step in a scheme to free Cohen, or for some other reason? Or, in the main, does it represent a sincere effort by Sorro to tell the truth? In his recantation he went over a broad field. It is evident that he might have told the truth in parts, and, for reasons of his own, suppressed it in other parts, as he did in his first statement about the bomb when he shielded the boy who went with him to locate Baff's house. The verdict against Sorro is not binding on me, because what convinced a jury beyond a reasonable doubt might not convince me at all. So, also, if the verdict had been in Sorro's favor, it would not have been binding on me.

I am to consider the evidence referred to not to ascertain whether Sorro was proved guilty of the perjury, but merely to determine whether, being governed by the preponderance of the evidence, it would be right or wrong for me to deny a new trial to Cohen.

The consideration of this matter divides naturally

into two parts. The first relates to the importance of Sorro's testimony in the case against Cohen. The second relates to the effect of his recantation on that testimony.

Cohen was indicted with several others. While the indictment simply charged them with the murder of Baff, the theory of the prosecution was that they had conspired to and did procure others to shoot him. In fact the People contend that there was a conspiracy long before those concerned planned for his death. The proof against the defendants who were tried on the indictment for murder was to the effect that these conspirators and others desired at first merely to frighten Baff in the hope, apparently, that he might refrain from " overcropping " and other vicious practices in which they thought he indulged, his competition being ruinous to them in various branches of the poultry business. A bomb was set on the porch of his residence at Arverne. A market in which he appeared to be interested was burned. Persons had been employed to prepare and mail threatening letters and horses were poisoned. Finally, the People charged, Cohen and others decided that Baff should be killed. Various gunmen were procured and several plans were tried by them. Eventually Baff was shot in an open and busy market on a particularly busy day by two assassins, who escaped in a waiting automobile.

It is important to note that, according to the theory of the People in the Cohen case, there was no conspiracy to kill until after the time when the bomb had been placed on the porch of Baff's house. For two reasons is it important now. In the first place those who were concerned in that crime and not in the subsequent crimes against Baff were not accomplices to the murder. Secondly, without proof of par-

ticipation by Cohen in the events subsequent to the placing of the bomb he could not have been convicted of the murder, though evidence of his participation in the entire chain of acts referred to, including the bomb incident, was relevant to the issue at the Cohen trial.

Before Cohen had been indicted one Arichiello and one Ferrara were separately tried, convicted and sentenced to be executed for the murder of Baff. Ferrara had confessed to being the driver of the car in which the gunmen escaped and Arichiello confessed that he was one of the assassins. Notwithstanding that each denied his confession, both were convicted.

Eventually Sorro was arrested and confessed to having placed the bomb, assisted by one Frank Burke and a man named Nino. Sorro and Burke made statements which, if true, involve Cohen in that crime. Cohen, it is said, acted principally through one Cardinale, whose story ultimately became the basic section of the proof on which Cohen was convicted.

When Sorro confessed to having placed the bomb Cardinale was in Italy. He had gone there in August, 1915, and had been drafted into the Italian army. In the chain of evidence being forged around Cohen Sorro's evidence was a most important link at that time. He was in custody, whereas Cardinale was overseas, in the service of his native land, a country which would not surrender him for trial.

Eventually, however, Cardinale was brought here on a stipulation that he would be returned to Italy within a stated time and that he would not be subjected to prosecution in this country.

At the Cohen trial Cardinale told a story of all the crimes against Baff referred to above. In each

instance he took a part in procuring some one to commit the crime, and, as he testified, always at the behest of Joseph Cohen, who paid the price of the person hired to commit it.

Cardinale's story was amply sufficient to make a complete case against Cohen for the murder of Baff, excepting for the requirement of section 399 of the Code of Criminal Procedure that there could be nc conviction without corroboration, from one who took no part in the murder plot, tending to connect Joseph Cohen with the commission of the crime.

Most essential for this purpose was Sorro's testimony. As already stated, he told of Cohen's connection with the bomb placing and, far more important, of a conference about a year before the murder in the Harlem chicken market of Cardinale and Jacobs, attended by the defendant Joseph Cohen, Jacob Cohen and David Jacobs and by Cardinale and one Ippolito Greco, who, as Cardinale had testified, was then and there procured to kill Baff or have him killed. Sorro's story was that they stood in a little group and discussed the matter while he was in and about the market and heard parts of the conversation, including a statement by Joseph Cohen that he "wanted" to pay $500 to have Baff killed. Sorro's testimony in reference to this Harlem meeting was also to the effect that, in the presence of Cohen and of Jacobs, Cardinale asked him to go for Greco, and that he did go to a nearby soloon conducted by Greco and called him to the meeting.

In all this he was but repeating substantially a part of Cardinale's story. But corroboration was essential, and it was for the giving of this very testimony about this meeting in Harlem that Sorro was convicted of perjury.

It tended to connect Cohen with the commission

of the crime of murder, and Sorro was held not to be an accomplice in the murder plot. The testimony was that he refused to take the part in the murder suggested to him by Cardinale. He knew of the plot and that it was progressing. He even took a small part in it by so calling Greco, but without becoming a participant in it. Accordingly Sorro was held not to be an accomplice. This was a close ruling. It is only fair to Cohen to say that it might not have been made if other testimony, corroborative of Cardinale, had been as important as that of Sorro relating to the Harlem murder plot meeting. By this I do not mean to challenge the correctness of that ruling or to intimate that it was unfair to Cohen, but merely that there would have been no occasion for it if there had been other testimony equally as important as Sorro's in directly implicating Cohen in the murder and satisfying the requirement of section 399 of the Code of Criminal Procedure. The fact that this ruling was made and that it was referred to in the opinion in the Court of Appeals as the most serious of all the errors alleged on behalf of Cohen (*People v. Cohen,* 223 N. Y. 406, 424) indicates the importance of Sorro's testimony against Cohen.

There was other testimony from persons not concerned in the crime of murder which might possibly be considered to corroborate Cardinale's story and to implicate Cohen in that crime. But there was none which at all approached Sorro's in satisfactorily meeting the requirement of the statute referred to above. Certainly none so directly implicated Cohen in the murder. Indeed there might be grave doubt as to whether any testimony other than Sorro's was sufficient, under the statutory requirement of corroboration, to implicate Cohen.

Burke told of his part in the bomb placing and of two meetings with Cohen and the others concerned. His testimony, if true, implicated Cohen in that crime. But, as pointed out above, Cohen could not have been convicted of the crime of murder if his participation in the crimes against Baff had ended there. Furthermore, if the bomb plot had been an integral part of the murder plot, both Sorro and Burke would have been accomplices, but, as already stated, the ruling was to the contrary. This reasoning is also applicable to the three meetings attended by Romano and to the letter written by Burke to Cohen, as well as to Cohen's admissions and denials in relation to them.

The testimony of Joseph Cohen himself, on cross-examination, was exceedingly damaging to him. It leaves one outstanding impression — that of a guilty conscience. And of this the prosecution took full value in summing up.

There were numerous matters which tended to work against Cohen, such as his associations, motive for the crime and two events in his past — an assault for which he was imprisoned while he was a boy and his attempts to become a member of the police force of this city, in connection with which he had sworn falsely as to his age and name. Wherever any of these matters tended to work against him he was ready with his denials. In some instances he retracted the denials when confronted with written records which could not be successfully contradicted. But in others, especially when the murder itself was approached, he persisted in denying records which, apparently, were unimpeachable.

Particularly was this evident in connection with his denial that he saw Baff's body before it was removed from the market. In this denial Cohen per-

sisted to the end, though he had been examined shortly after the murder, and then, according to the stenographer's notes, stated that he saw the body at one of the stands in the market and described in detail where and how it was lying, the surrounding crowd of spectators and other circumstances.

He also contradicted a witness who swore that he saw him peering at the body over a low door or other obstruction, as well as witnesses who testified to conversations with him immediately after the shooting. So also as to witnesses whose testimony tended to show motive or that he had expressed himself as against Baff even to the point of having him killed. Likewise as to records and other evidence which indicated that he had been treasurer of an association of persons having business around the market which seems to have been opposed to Baff and his practices, there having been testimony that Cohen had intimated that moneys which he is alleged to have paid at various times as the price of violence against Baff came from others, from an association. In fact the summation for the People openly charged that there were others " higher up " besides Cohen.

Cohen's testimony at his trial that he practically never went to the market of Cardinale and Campo is hard to believe. And at one time, long before his trial, he was in doubt whether he had seen Sorro there.

The opinion in the Court of Appeals, where one judge dissented from the affirmance of Cohen's conviction, states that a review of the case, " including Cohen's own statements and denials, shows that there is ample evidence " in the nature of corroboration of the statement of Cardinale that Cohen instigated the killing. 223 N. Y. 406, 426. This reference to Cohen's statements and denials as being

corroborative of Cardinale has given me serious pause.

In the same opinion there are several expressions which indicate that, on the entire record, the jury might have found reasonable doubt as to Cohen's guilt, though the gist of the affirmance seems to be that Cohen was apparently guilty. At page 423 it is stated that a question of guilt was presented "which could only be solved by a jury." Reference is made more than once to the dangerous type of criminals who were the main support of the prosecution, and the court rests on the statement at page 422 that "there is no absolute safeguard against mistake or perjury. A high degree of probability is all that we can expect."

Again, as bearing favorably on the application, it must be conceded that Cohen's conviction rests on Cardinale's story. If his testimony "is rejected as unworthy of belief the prosecution must fail." *People* v. *Cohen,* 223 N. Y. 406, 412. At the same place it is stated that "Cardinale is a self-confessed criminal of a dangerous and vicious type." He was in a most unusual position of advantage to further any motive he may have had in bringing about Cohen's conviction. He was in this country under an agreement with the government of Italy which rendered him immune to prosecution here and which apparently left him free to testify or not as he himself desired. At Cohen's trial he did refuse to tell the names of the assassins who, according to his version, did the shooting. He also refused to answer other questions. He was not subject to fear of punishment, at least in this country, for perjury or for any crime in which he had been involved, even for murder. Nevertheless he was held to be a competent witness. As pointed out by the Court of

Appeals, he may have advanced his own interests by bringing about Cohen's conviction. It appears also that Arichiello, Gagliano, Rosenstein, Sorro and others went free after Cohen's conviction. Motive for Cardinale's giving testimony to connect Cohen with the murder would not be difficult to conceive.

Furthermore, Cohen made no admissions which can be said to admit participation by him in the murder plot to which Cardinale testified. It is not clear that Cohen's denials, such as they are, and considering them in full detail, are to any appreciable extent corroborative of Cardinale's story. So far as they go, the denials are almost entirely denials of everything which might tend to be corroborative. Assuming, in view of his cross-examination, that he was lying, nevertheless they are denials and not admissions.

But I give this statement in the opinion of the Court of Appeals its greatest weight against Cohen on the present application. See, also, *People* v. *Becker*, 215 N. Y. 126, 140, 142. Doing so, it nevertheless remains a fact that there is no testimony comparable with Sorro's in meeting the requirement of section 399 of the Code of Criminal Procedure. Burke did not pretend to go further in time and event than the bomb setting. Sorro brought the murder home to Cohen not by inference, but by direct connection in fact. If his testimony of the meeting at the market of Campo and Cardinale is not false, Cohen must be guilty, for it leaves no room for any other conclusion.

Inference is the outstanding feature of all testimony other than Sorro's tending to connect Cohen with the killing of Baff, leaving out the testimony of those concerned in the murder plot and its execution. So also as to Cohen's own testimony. However

strongly it may leave one impressed with a feeling that he had much to conceal, only by inference does it point to his guilt. Its effect on the jury may have been decisive. But, assuming that Cohen's testimony could be accepted in lieu of corroboration under said section 399, it has not the direct and necessarily conclusive effect of Sorro's testimony as to the Harlem meeting if we give full credence to Sorro.

Much of the testimony damaging to Cohen, including his cross-examination, related to events following the murder and tended more to show a guilty conscience than, by proof of word or deed of his in furtherance of the murder plot, to implicate him. Not so with Sorro's testimony. The importance of his testimony is indicated by the charge of the court and summation for the People at the Cohen trial. The part of the charge relating to Sorro's testimony covers sixteen folios of the printed case on appeal, or over one-tenth of the main charge of fifty-two pages. In the summation, at folio 7965, we find that the jury was told by counsel for the People: " Cardinale is an accomplice and Sorro has nothing to do with it except that he was there and heard what was said — if you believe Cardinale and Joe Sorro, and if you are convinced that they are telling the truth, that evidence, the court will charge you, is sufficient to convict in this case."

One piece of testimony emphasized by the prosecution, as tending to corroborate Cardinale and implicate Cohen, indicates by contrast the importance of Sorro's testimony. Cardinale had testified to a conversation in the yard of Cohen's house and he described the yard as having flowers in it. On cross-examination Cohen admitted there were flowers in the yard. That was but a very weak thread compared with the strong link forged by Sorro in his testimony about the Harlem meeting.

Thus it will be seen that an analysis of the record in the Cohen case confirms the view of the attorney-general that " Sorro's evidence was sufficiently important so that if it was false and perjured Cohen should be granted an order for a new trial." As to the law in this situation see *People* v. *Shilitano,* 218 N. Y. 161; *Benfield* v. *Petrie,* 3 Doug. 24; *Great Falls Mfg. Co.* v. *Mathes,* 5 N. H. 574; *Horne* v. *Horne,* 75 N. C. 101; *Dennis* v. *State,* 103 Ind. 142, 147.

We come to the second point, the weight to be given to Sorro's recantation.

The jury which heard the case against Sorro has found, I repeat, that his testimony about the meeting in the Harlem market was perjured. As a result he has entered upon a long term of imprisonment. Independently of that verdict, however, I have considered the entire record in the case of *People* v. *Sorro,* as well as the stenographer's transcript of his recantation, his reaffirmance of it in his deposition taken at Baltimore, and his later statement at New York in which he said his recantation was false. I have reached the conclusion that the recantation was made in good faith and that it entitles Cohen to a new trial.

Although it means added length to a long opinion, I deem it proper, in view of the importance of the case, to indicate my reasons for so concluding. But first I desire to note that this conclusion as to Sorro and his testimony makes it unnecessary for me to conduct an original inquiry, under section 465 of the Code of Criminal Procedure, subdivision 7, by hearing the witnesses anew as to the fact that he did recant or as to when he told the truth. His recantation is, as stated, evidenced by the stenographer's transcript thereof, signed and sworn to by him. It was fully admitted by him at his trial. The record of that trial satisfactorily demonstrates to me that, in the main,

he made it in a spirit of sincerity and truthfulness. Under the crcumstances there is no occasion for further hearings.

As Cohen's participation in Baff's murder was charged to be a part of a conspiracy, so also has Sorro been convicted of perjury as part of a conspiracy. Briefly stated, the theory of Sorro's guilt is that he gave false testimony against Cohen as a result of a conspiracy to get Arichiello out of prison and to relieve others who might be subjected to prosecution on the charge of murdering Baff.

Reference has been made to the return of Cardinale from Italy. Before his arrival counsel had been obtained for him, a lawyer who had taken up Arichiello's case after his conviction for the murder, and who was also counsel for one Gagliano, an uncle of Cardinale's wife, who had been indicted for the murder before the conviction of Arichiello. It was charged at Sorro's trial that one Musica, who had associated himself with the lawyer referred to and who had previously assisted the district attorney and the attorney-general in the investigation of the Baff murder, conspired with Cardinale and others to the end stated. He, it is asserted, is the one who induced Sorro to commit perjury.

It is said that Cardinale's first statement after his return to this country was made to Musica, Cardinale having refused to talk before seeing his relatives here, who had retained counsel for him; and that, though the statement to Musica was taken down by a stenographer, neither the notes nor a copy of the statement can be found. The implication is that Musica desired, and ultimately obtained, a different statement — one calculated to serve the purpose of putting Cohen in prison, in the death house, and of getting Arichiello out. These features of the case

against Sorro cannot be avoided in any consideration of the probabilities bearing upon the good faith of his recantation. So far as possible, however, I have considered the question here apart from the alleged conspiracy on which the prosecution of Sorro rested.

In the month of January, 1919, a year and one-half after Cohen's conviction, Sorro called on the district attorney, stated that he had lied in his testimony against Cohen and indicated a willingness to set matters right. He was subjected to an extensive examination, occupying numerous sessions on three or four different days running over a period of a week. This deposition, transcribed in question and answer form, covers seventy-five full pages. It is an exhibit in the Sorro case and has been referred to herein as his recantation. It indicates that as a result of the conspiracy referred to he deliberately committed perjury in important parts of his testimony against Cohen. For present purposes only his testimony of the meeting in Harlem need be deemed material. According to the recantation no such meeting ever occurred within his knowledge.

Sorro was in the service of the United States when he recanted, and shortly thereafter we find him in that service near Baltimore. He was located there by a representative of the attorney-general of this state, and examined by the lawyer who had been in charge, as special counsel appointed by the attorney-general, of the prosecution of Cohen and those tried with him. This was about two weeks after he had completed his recantation in the district attorney's office, and the statement he made was still to the effect that he lied against Cohen. The examination at Baltimore embraced a line of questioning somewhat different from that adopted by the representative of the district attorney. It was extensive, the transcript cover-

ing 130 pages of two folios each. But a week there-
after he was examined in New York by another lawyer,
who also represented the attorney-general in the pros-
ecution of the case of *People* v. *Cohen and Others.* On
this occasion he said he lied when he recanted, and in
this story, retracting his recantation, he has persisted.
Nevertheless he has been convicted of perjury as above
stated.

When Sorro came to the district attorney and made
his recantation it appears that his expressed reason
therefor was a desire to right the wrong he had done,
as Cohen was then under sentence of death. When
Sorro was tried for perjury, Cohen's death sentence
having been meantime commuted to life imprisonment,
he said he had been hounded and frightened by per-
sons working in the interests of Cohen until he finally
decided to endeavor to help him by going to the author-
ities and falsely stating that he had lied against him.

Sorro's story at his own trial was that after the
Cohen trial he was drafted into the service of the
United States; that he was from time to time spoken
to by others in and out of the service who annoyed
and worried him by reason of his having testified
against Cohen; that he was eventually attached to a
war plant in Long Island City, apparently as a motor
truck driver; that he went to his own home at night,
arriving there at irregular hours, between seven and
ten o'clock; and that one night on his way home he
was accosted by two strange men whom, even in his
own defense at his trial, he was unable to name or
even describe. He says these two strangers, though
they did not make appointments to meet him, continued
to accost him on subsequent nights while he was going
home until they had met him some ten times, and that
they concocted for him and taught him to tell the story
which constitutes his recantation. According to his
latest story, their actions must have been part of a

concerted offensive against him, joined by at least one
of those who, as he asserts, had been hounding him,
one who, as he states, was a partner of a brother of
Cohen. After threats and promises of large sums of
money, he says, he was put in connection with a
brother-in-law of Cohen and with the lawyer for
Cohen. But when he first retracted his recantation
the details as to the pressure brought on him to re-
cant, as to the persons involved and as to the alleged
promises of money therefor, varied from the recital
of the same matters at his trial.

That he was taken to the district attorney's office
by Cohen's lawyer is true. But it is likely that Sorro
was sent to him because he desired to recant, the
lawyer being expected to know how he should go about
it.

The story of the two strange men who managed to
meet him in the streets ten times on cold winter nights,
when, as Sorro said, the weather prevented long inter-
views, and to coach him for his recantation, is too
shadowy and flimsy for belief. When it is remembered
he was on trial for a serious crime this explanation
fails to create an impression that it is truthful. Its
effect is to strengthen rather than to weaken the recan-
tation.

A study of the various statements made by Sorro,
in the light of all the circumstances, brings out many
things favorable to the view that in the recantation
he adhered more closely to the truth than he did at
Cohen's trial or at his own.

For example, in his first statement of the bomb
matter, he did not say, as he did at Cohen's trial, that
he had seen and talked to Cohen about setting the
bomb before he placed it on the porch of Baff's house.
In this respect he changed his story, thereby making
it somewhat worse as against Cohen.

Another instance relates to the meeting in the Har-

lem market. When first arrested in the bomb matter he appears not to have mentioned it. Again, up to the end of the Cohen trial it seems that he had spoken of only one meeting in that market between those whom, according to his testimony, he had heard plotting Baff's death. Later on he referred to several such meetings. Here again it is possible to find a studied effort to injure Cohen. Had there been not only one but several such meetings in his presence, would it have been believed that he was not concerned as an accomplice in the murder plot? Furthermore, the circumstances of the Harlem meeting, as told by Sorro at his own trial, make it very doubtful that he could have heard such a conversation while he was going about the market attending to other matters. And it is not likely that Cardinale would have asked him to stay around that night merely to send him a short distance for Greco; for a man of Cardinale's guile would feel the need of keeping a plot to commit murder as secret as possible.

In some details the recantation itself is seemingly untrue. In his statement of what happened on the night of his arrest and his reasons for falsely, according to his recantation, implicating Cohen in the bomb setting, he is contradicted as to important details by a representative of the police and a representative of the district attorney of Queens county.

But after a consideration of the whole record in the case against Sorro and a study of his testimony and that of Cardinale at Cohen's trial, considering as well the nature of the Harlem meeting and all the circumstances brought out in both cases, including the fact that the indictment against Sorro in Queens county for placing the bomb was dismissed before he recanted, I am left with the impression that Sorro was, in the main, endeavoring to tell the truth when

12

he was making his recantation. In my opinion, therefore, according to a preponderance of the evidence, Sorro did give perjured evidence against Cohen.

Attention has been called to the difficulties which will confront the People of the State of New York in an effort to bring Cohen to trial again if this motion is granted unconditionally, the suggestion being that the ultimate probable consequence of such a decision will be to set Cohen free. It would of course be regrettable, assuming him to be guilty, that Cohen should escape the penalty of his crime. But, on the other hand, it would be even more regrettable if, being innocent, as under the law he is deemed to be until his guilt is established, he should be compelled to spend the remainder of his life in prison. He has already been confined in state's prison for a period of over four years, two of which he spent in the death house awaiting execution, following a conviction which I believe was based on perjured evidence.

A minute examination of the record of Sorro's trial satisfies me that a reversal of the judgment of conviction as against the evidence or on the grounds of passion or prejudice is not within the bounds of probability. If, which is always possible, there should be a reversal on alleged errors of law it would not affect the merits. To comply with the request of the attorney-general would be not only to act without legal warrant, but also would be to withhold from Joseph Cohen the relief which, in my opinion, he is unquestionably and unconditionally entitled to at this time.

At least two beings in the universe, and possibly no more, know absolutely whether Cohen is guilty or innocent of this murder — his Maker and Cohen himself. How that question is to be determined, or whether it can be determined by any human tribunal

are matters involving considerations which are extraneous to the record and which must be left to the future.

The efforts of society to protect itself against its enemies by measures to prevent or to punish crime are usually controlled in our law by principles adopted for the purpose of safeguarding the individual. This is inevitable where freedom is paramount. Occasionally section 399 of the Code of Criminal Procedure may become a stumbling block in the path of justice, an obstacle in the way of the prosecution which can be neither removed nor surmounted. But the wisdom of that statute is firmly based on the maxim that it is better that ten guilty men shall go free than that one innocent man shall be punished, a working principle which will probably abide with us as long as crime itself.

We are frequently reminded that the law at best is only a human effort towards absolute justice, a fact which is emphasized by the opinion of the Court of Appeals in this very case. Diligent and in a measure successful efforts have already been made by their representatives to vindicate the People of the State of New York by bringing to book the perpetrators of this notorious crime. If those efforts are destined not to be entirely successful in this case, it will be borne in mind by the People of the State of New York that human judgment is not infallible and that their courts are called upon to render not absolute justice, but justice under the law — the institution left to us by the experience of man through the ages as the safest basis of legal action.

The motion will be granted.