■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSE WALTER CESAR, Appellant. THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ORELIO MARTINEZ, Appellant. — Judgment of the Supreme Court, New York County (Frederic S. Berman, J., at suppression hearing; George Roberts, J., at sentence), rendered on September 13, 1984, which convicted defendant Jose Walter Cesar, upon his plea of guilty, of criminal possession of a controlled substance in the second degree and sentenced him to an indeterminate term of from four years to life, is reversed, on the law, the judgment of conviction vacated, the motion granted to the extent of suppressing the gun and the narcotics seized from the table drawer, and the matter remanded for further proceedings.

Judgment of the Supreme Court, New York County (Frederic S. Berman, J., at suppression hearing; George Roberts, J., at sentence), rendered on February 16, 1984, which convicted defendant Orelio Martinez, upon his plea of guilty, of criminal possession of a controlled substance in the second degree and sentenced him to an indeterminate term of from five years to life, is reversed, on the law, the judgment of conviction vacated, the motion granted to the extent of suppressing the statement relating to the one-half kilo of cocaine, and the matter remanded for further proceedings.

A hearing was held in connection with defendants' motion to suppress certain statements and physical evidence. According to the People's evidence, the Manhattan South Narcotics Area office of the Police Department received an anonymous telephone tip on the morning of March 28, 1983. The caller stated that cocaine dealers from Miami, Florida, were staying at the George Washington Hotel in Manhattan and specifically mentioned rooms 1044, 947 and 1444. This information was passed along in a written message to Sergeant John Creegan, who at first purportedly interpreted it as referring to only one room, 1044, followed by the telephone number 947-1444. Sergeant Creegan, accompanied by Lieutenant William Allee and Officers Richard Coscia, Douglas Assiff, James Annunziata and Joel Bridgewater, proceeded to the hotel, which is located on Lexington Avenue near 23rd Street. Upon their arrival, Sergeant Creegan spoke to the desk clerk. The registration card for room

1044 indicated that although persons from Florida had rented that room, they had already checked out and been replaced by people from Mexico. The officers then went to room 1044 but no one responded to their knock on the door. They returned to the lobby where Sergeant Creegan placed a telephone call to 947-1444, which rang in a Times Square restaurant.

Eventually the officers determined that the numbers 947 and 1444 referred to two additional rooms at the hotel. After subsequently examining the registration cards for rooms 947 and 1444, they learned that room 947 was registered to a J. Cesar from Orlando, Florida, who was also paying for rooms 1015 and 1033. A telephone billing card for room 1033 revealed that calls had been made by someone named Martinez. The registration cards for room 1444 contained the names of a Mr. and Mrs. Susanna from Miami and a Mr. Omar Saranti, also from Miami. Thereafter, the officers decided to visit rooms 1444, 1015, 1033, and 947, in that order, beginning with the one on the highest floor and working down from there. However, for purposes of the instant appeal, this court need consider only the events which occurred with respect to the last two rooms. In that regard, when Officer Coscia reached room 1033 and knocked on the door, a female voice, later identified as Maria Lezo, called out, "Who is it?" Officer Coscia replied that it was the police, and Lezo opened the door asking, "What is it?" The officers explained that they were investigating a narcotics complaint and requested permission to enter the room. Lezo, who was wearing a nightgown, asserted that her husband was sleeping and that she wasn't dressed. Officer Coscia stated that he didn't mind, whereupon Lezo opened the door to admit the officers.

As the officers walked into the room, Lezo went into the bathroom, closing the door behind her. Once inside, the officers noticed defendant Orelio Martinez resting on the bed. The defendant got up and pulled on his trousers. The officers started to question Martinez, who gave his name, declaring that he was from Florida and was in New York on vacation. At that point, Sergeant Creegan and Officer Annunziata entered the room. While the interrogation of the defendant continued, Officer Annunziata spotted a closet situated about one to two feet from where he was standing. The door was open approximately 8 to 10 inches. Looking into the closet, Officer Annunziata saw a large plastic bag containing a white powder which was resting *on an* eye-level shelf. Officer Annunziata reached into the closet and retrieved the plastic bag. He then observed some empty plastic bags lying on top of a dresser. A plastic millstile, an item used for cutting cocaine, was inside a partially open drawer.

Sergeant Creegan thereupon placed the defendant under arrest. Officer Coscia opened the bathroom door and directed Lezo to come out, advising her that she was under arrest. The bathroom door opened in towards the main room. Hanging on the inside of that door was a red canvas bag. As Lezo emerged from the bathroom, Officer Coscia took down the bag. Upon feeling the contours of a gun, he removed a loaded .357 magnum revolver. At this point, the officers halted any further search of the room pending the procurement of a search warrant. Following the arrest of Martinez and Lezo, Officer Bridgewater brought Rudolfo Gomez from room 1444 to room 1033. Officer Bridgewater read the three individuals their constitutional rights, and all three indicated that they did not wish to speak with the officers.

Shortly after 2:00 P.M., Lieutenant Allee arrived at room 1033. He and Sergeant Creegan then proceeded to room 947. Sergeant Creegan's knock on the door elicited the query, "Who is it?" The officers again announced that it was the police and requested to speak with the occupant. Defendant Jose Cesar opened the door slightly and was informed by the officers that they were conducting a narcotics investigation. Officer Creegan asked Cesar if the room was his, and the latter replied in the affirmative. During this conversation with the defendant, the officers noticed two other men, Thomas Montgomery and Wilbert Bunkley, seated inside the room. The officers observed Montgomery stand up, drop a plastic bag of white powder to the floor and attempt to kick it under the bed. Sergeant Creegan immediately came into the room and picked up the bag. At that point, the officers drew their weapons, and Lieutenant Allee ordered the three men against the wall. Lieutenant Allee went over to a low table located near the area where Montgomery had been sitting. As he was opening the drawer of the table, Lieutenant Allee inquired if there were any guns in the room. Defendant Cesar stated that there was one in the drawer. Looking into the drawer, Allee commented that he did not see the gun, demanding to know where it was. After Cesar responded that the gun was under a piece of paper, Lieutenant Allee lifted a newspaper in the drawer and found a loaded .38 caliber revolver, along with small plastic bags of white powder and some marihuana.

Following his discovery of the gun, Lieutenant Allee advised the three men in room 947 of their constitutional rights. Officers Assiff and Coscia were assigned to guard Cesar, Montgomery and Bunkley pending the acquisition of a search warrant. During the wait for the warrant, Cesar asked about the delay and

also volunteered that the gun and the cocaine in the room belonged to him and that the other two men were not involved. In the meantime, Lieutenant Allee was passing the time in room 1033 with Martinez, Lezo and Gomez. Martinez, who was described by Lieutenant Allee as being very friendly and sociable, struck up a conversation. Although Lieutenant Allee did not refer to what was in the room, Martinez blurted out, "Why don't you just search the room and get it over with so we can get out of here". The defendant explained that the police would not find more than one-half kilo of cocaine. In the course of their discourse, the two men discussed, among other subjects, the drug trade, varieties of cocaine and the fact that the revolver which had been removed from the red canvas bag had been purchased legitimately in Florida by the defendant and cost more than $1,500.

A warrant authorizing the search of rooms 1033 and 947 was finally obtained that evening. Officer Annunziata telephoned Lieutenant Allee from the courthouse to notify him that the warrant had been signed. In a search of room 947, Officer Assiff uncovered three plastic bags of cocaine and a bag of marihuana from the same table drawer in which the .38 caliber Colt revolver had previously been found. He also discovered a plastic bag of cocaine under the bed and a triple-beam scale in the closet. In room 1033, Officer Bridgewater removed four plastic bags of white powder from the night table drawer, two plastic bags of white powder from the top dresser drawer and two plastic bags of white powder from the closet shelf. Officer Bridgewater also confiscated a white cloth bag containing a plastic bag of white powder, a millstile, a plastic funnel, two scale weights and a box of plastic bags, as well as the previously recovered .357 magnum revolver.

The prosecution's version of the facts was disputed by various defense witnesses. However, since the hearing court credited the testimony by the officers and discounted the evidence submitted by the defendants, we will confine our review herein to a consideration of the People's case. Where the issue is largely one of credibility, this court will not generally interfere with a determination on a motion to suppress by substituting our views for that of the hearing Judge. (*People v Vincente,* 100 AD2d 789.) The reason for this rule is that the trier of facts " 'has the advantage of observing the witnesses and necessarily is in a superior position with respect to that aspect than an appellate *court* which reviews but the printed record' " (*People v Stroman,* 83 AD2d 370, 372).

Based upon its acceptance of the account offered by the police officers, the hearing court made the following findings with

respect to Martinez: (1) that the anonymous telephone call, in conjunction with the information supplied by hotel personnel, constituted a sufficient predicate for the investigatory inquiry at rooms 1444, 1015, 1033 and 947; (2) that Lezo had consented to the officers' entry into room 1033; (3) that the plastic bag recovered from the closet in room 1033 was in plain view; (4) that the gun inside the canvas bag was properly seized as a search incident to a lawful arrest; (5) that the search warrant was validly issued; and (6) that Martinez's statement to Lieutenant Allee regarding the half kilogram of cocaine was admissible as a spontaneous declaration. The court did, however, grant suppression of Martinez's other statements on the ground that they had been the product of police conduct.

As for the Cesar case, the court concluded: (1) that the police were justified in entering room 947 when they observed a plastic bag of white powder fall to the floor; (2) that notwithstanding Cesar's remarks concerning the location of the gun, which were ordered suppressed, the weapon and contraband removed from the table drawer were properly seized as being within the defendant's "grabbable area" and would, at any rate, have been discovered as a search incident to an arrest; and (3) that Cesar's statement to Officer Assiff in which he claimed ownership of the narcotics and gun was admissible as a spontaneous declaration.

### The Martinez case

The information possessed by the police as a result of the anonymous telephone communication, as corroborated by the details furnished by hotel clerks and the registration cards, was clearly sufficient to provide the officers with a proper basis for making inquiry at the rooms. (*See, People v De Bour,* 40 NY2d 210.) After the officers arrived at room 1033, they knocked on the door, identified themselves, explained the purpose of their visit and asked permission to come in. They were then allowed entry by Lezo. In that regard, except for Lezo's testimony, which was discounted by the hearing court, that the officers pushed their way in, there is no indication that the police exerted any pressure on her or otherwise forcibly gained admittance into the room. Indeed, the proof conclusively established that Lezo voluntarily consented to the police entry. (*See, People v Gonzalez,* 39 NY2d 122.) Once inside, Officer Annunziata, who was standing near an open closet, saw a large clear plastic bag lying on the shelf. The law is well-settled that during the course of a lawful investigation, the police may seize contraband which is in plain view. (*Coolidge v New Hampshire,* 403 US 443; *People v Spinelli,* 35 NY2d 77.) Similarly, the seizure by Officer Annunziata of the plastic bags resting on top of the dresser, as well as the millstile

found inside a partially opened drawer, comes well within the parameters of the plain view doctrine.

When Officer Coscia opened the bathroom door to arrest Lezo, he noticed a red canvas bag hanging on the door only a few feet away from her. As she went through the passageway between the bathroom and the main room, she would have literally brushed against the bag. Thus, considering the narcotics already found in the room and Lezo's proximity to the bag, it was not unreasonable for the officer to take the precaution of removing it from the door. In so doing, he felt the contours of a gun and retrieved a loaded .357 magnum revolver. Under these circumstances, the actions by Officer Coscia are also within permissible constitutional limits. (*See, People v Gokey,* 60 NY2d 309; *People v Smith,* 59 NY2d 454.)

However, Martinez's comment relating to the one-half kilo of cocaine was wrongly deemed admissible by the hearing court as a spontaneous declaration. At the time that Martinez allegedly blurted out this statement, he had already indicated that he did not want to answer any questions. When an individual has invoked his right to remain silent, the test for spontaneity is whether the statement at issue was "triggered by police conduct which should reasonably have been anticipated to evoke a declaration from the defendant" (*People v Lynes,* 49 NY2d 286, 295; *see also, People v Howard,* 62 AD2d 179, *affd* 47 NY2d 988). In the present situation, after Martinez had already declined to speak with the police, Lieutenant Allee engaged in what the People characterize as a desultory, friendly discourse with the defendant. While it is true that Martinez began the conversation, it is also evident that Lieutenant Allee not only encouraged that conversation, but used it as a subtle form of interrogation to elicit admissions from the defendant. Indeed, in an application for a commendation, Lieutenant Allee described his conduct as a "skillful interrogation".

### The Cesar case

As already noted, the officers had an "articulable reason sufficient to justify" their inquiry at room 947. (*People v De Bour, supra,* at p 213.) From the open doorway, the police observed Montgomery drop a bag of white powder to the floor and attempt to kick it under the bed. Having thus seen the contraband in plain view and witnessed Montgomery's furtive movements, probable cause existed to arrest Cesar. Sergeant Creegan immediately went into the room and picked up the bag. The officers drew their weapons and directed the three occupants of the room to stand against the wall. At this point, the defendant was in custody and should immediately have been

advised of his *Miranda* rights. Since no such warnings were read until after the search of the table and recovery of the weapon, Cesar's statements in response to Lieutenant Allee's question about the location of the gun are inadmissible.

When the drawer of the table was first opened by Lieutenant Allee, neither the gun nor the narcotics was visible, and it is doubtful whether these items would have been discovered in the absence of Cesar's statements. The evidence taken from the table drawer should, consequently, have been suppressed. Moreover, in view of the fact that the three men had been moved against the wall where they were being frisked by two police officers having their guns drawn, and the table was clearly not within their reach, Lieutenant Allee was not authorized to undertake a warrantless search of the table. However, defendant's remarks to Officer Assiff concerning the ownership of the narcotics and gun are admissible because by then he had been given his *Miranda* rights, and that statement was entirely unsolicited.

Notwithstanding the improper seizure of the weapon and drugs from the table in room 947, there was a sufficiently untainted basis to support the search warrant herein. The hearing court thus correctly declined to controvert the warrant. Concur — Sandler, J. P., Asch and Milonas, JJ.

Carro and Fein, JJ., dissent in a memorandum by Carro, J., as follows: By its decision to reverse and grant suppression as to some of the contraband and statements, the majority recognizes the existence of at least some improprieties in the conduct of the police. Unfortunately, the majority does not do nearly enough to uphold the constitutional rights of these defendants in this case so obviously replete with incredible and inherently unreliable testimony containing "all appearances of having been patently tailored to nullify constitutional objections." (*People v Garafolo,* 44 AD2d 86, 88.) The majority's opinion recites the facts in accordance with the People's case, since that testimony was totally credited by the hearing court. However, after viewing the record as a whole, including the related testimony of the searches of two other hotel rooms conducted pursuant to the same telephone tip, we conclude that the testimony of the People's witnesses cannot be credited. In support of this position, we find it necessary to give a more comprehensive review of the facts.

The majority's opinion adequately sets forth the predicate for the decision to make inquiries at rooms 947, 1015, 1033 and 1444. It was sometime after noon when the five officers, Creegan, Annunziata, Coscia, Assiff and Bridgewater, proceeded to

room 1444. Creegan knocked on the door and a voice responded "Who is it?" Creegan identified himself as a police officer and requested to speak with the occupant. Creegan testified that Rudolfo Gomez opened the door fully, permitted the five officers to enter his room, at which point the officers immediately observed a quantity of white powder and plastic containers of marihuana in plain view on a dresser. Gomez was arrested. The police searched his person and recovered a plastic egg-shaped object containing a rock of white powder. Cocaine was also found on top of a night table. Creegan did not recall opening any doors or searching the closets or dresser drawers in that room. Despite having found narcotics in plain view, the officers decided not to apply for a search warrant for that room.

Gomez testified that he was awakened by the sound of knocking on his door. Expecting defendant Cesar, he opened the door. Instead, he met with four or five police officers. They entered uninvited and began to ask questions and search the room. The officers searched "everywhere", including his briefcase, the bed, under the pillows, and inside his pants pockets which were lying on a chair.

While Bridgewater remained to guard Gomez, the other officers proceeded to room 1015. Creegan knocked on the door. A woman, later identified as Jean Pernia, answered and asked who was there. Creegan replied that it was the police. He asked her to open the door and stated he wanted to question her. Officer Coscia recalled that Jean Pernia opened the door and came out into the hallway with a child, closing the door behind her. Creegan asked her for identification and she went back into the room closing the door again. About a minute later, Coscia heard a toilet flushing and the officers knocked on the door again. At this point Assiff and Coscia were directed to go to room 1033.

Annunziata testified that Pernia came out into the hallway alone and left her door open. Finally, Creegan testified that Pernia opened her door and he asked her permission to enter. Creegan added that Pernia responded by closing the door, after which the officer heard a flushing sound. Pernia then opened the door again and invited the officers inside. Creegan saw no drugs in plain view but did see a beeper, which he stated is commonly used by persons involved in narcotics activities to communicate amongst each other. Creegan and Annunziata soon left the room *to join* Assiff and Coscia in room 1033.

A second visit to room 1015 took place later. Creegan testified that he returned to room 1015 to inquire about the beeper but alleged that he did not search that room. This apparently took

place after the officers had already entered rooms 947 and 1033 and had decided to obtain search warrants for those rooms. Creegan and Annunziata were sent to obtain the warrants.

Annunziata testified that as he was leaving the hotel, he saw Jean Pernia, her husband and their two children with their luggage outside in the street. Even though they were vacating the hotel, Annunziata claimed that they nevertheless volunteered to go back up to their room with the police. Annunziata testified that it was no longer their room and he proceeded to search it, but found nothing, not even the beeper. He could not recall if the Pernias and their children were searched. He did admit, however, that a policewoman was sent to the room. He also did not recall searching the Pernias' luggage.

Jean Pernia's recollection of the events differed. Sometime after 1:00 P.M. there was a knock on her door. She opened the door. Four or five police officers were outside the door. She was told they were conducting a narcotics investigation and was requested to give them identification. The officers then entered the room without her permission and looked through the closets and throughout the room. They found nothing and left.

Soon afterwards the Pernias heard a lot of noise coming from the hallway and looking out their door saw a man handcuffed. At that point, the Pernias, who had a baby and small child with them, decided to pack up and leave. They collected all but one piece of their luggage and proceeded to go outside and hail a taxi to start putting their belongings in the cab. At that point a police officer brusquely approached Mrs. Pernia, grabbed her arm and demanded that she not move. He asked whether her husband had any weapons. Pernia stated that her husband did not. He then told her that they had found what they wanted (the entries into rooms 947 and 1033 had already taken place), but the Pernias would have to go back to their room with the police. They returned to their room, and her husband opened the door for the police. The officers then proceeded to search the room and her luggage thoroughly. A woman police officer was summoned to search Mrs. Pernia. Her daughter was searched as well. Nothing was found.

More eventful, however, were the entries into rooms 1033 and 947. Coscia and Assiff were the first to arrive at room 1033. Coscia knocked and a woman, later identified as Maria Lezo, asked "Who is it?" After Coscia replied "Police", the woman opened the door. The officers explained that they were conducting a narcotics investigation and requested entry into the room.

Lezo, who was ill and dressed either in some sort of nightgown or a T-shirt and underwear, explained that her husband was

sleeping and that she was undressed. Coscia stated that he did not mind. Lezo then opened the door fully to allow the officers inside and immediately stepped into the bathroom. Martinez, who had been lying in the bed, began to get up and put on his slacks. Upon entering the room Coscia noticed a marihuana cigarette and a straw cut in half, which he knew was commonly used as a cocaine sniffer, on the floor. These items, which were not noticed by any of the other officers, were never vouchered.

Creegan, who had walked in moments later with Annunziata, began to ask Martinez questions. Annunziata, meanwhile, was standing one to two feet away from a closet to his right. The closet door had been left open 8 to 11 inches with the opening facing Annunziata. Although the closet was unlit, Annunziata claimed to have been able to see clearly a plastic bag containing white powder sitting on a shelf at eye level. He reached in, grabbed the bag and showed it to the other officers. He claimed he was also able to see a millstile, an item used for "cutting" cocaine, inside a dresser drawer which had been left open four to five inches. In fact, he stated that all the drawers were left open to some extent. He also saw plastic bags on a dresser. Only Annunziata claimed to have seen these things, even though he was the last of the four officers to enter the room.

The decision was then made to arrest Martinez and Lezo, who was still in the bathroom. Coscia opened the door to the bathroom to arrest Lezo. He noticed a canvas bag hanging from the inside of the door. He told the woman, who was sitting on the toilet without any pants, to get up. He also grabbed the bag, felt that it contained something hard, which he believed to be a gun. He looked inside and pulled out a large revolver. Officer Creegan testified that no further search took place; they merely secured the room pending a search warrant. Bridgewater, meanwhile, brought Gomez from room 1444 to room 1033 and proceeded to advise Lezo, Martinez and Gomez of their *Miranda* rights. Each was unwilling to answer questions without a lawyer. However, at a later point a number of alleged spontaneous statements were made.

Shortly after 2:00 P.M., Lieutenant Allee arrived at the hotel and responded to room 1033 where he met Creegan and the other officers. Allee and Creegan then decided to investigate the last of the four rooms, room 947.

Allee and Creegan went to room 947 and knocked on the door. A male asked "Who is it?" They replied "police" and asked to speak with the person inside. It took about a minute for that person, defendant Cesar, to open the door. Allee testified that once the door was opened he stepped inside the room, gun

drawn, and began to ask Cesar questions. At the moment, he saw two men rise from their seats and saw a plastic bag with white powder roll off the lap of one man, a Mr. Montgomery. This man attempted to kick the bag under the bed. Allee told the men to get up against the wall and directed Creegan to recover the bag.

Creegan testified that as Cesar partially opened the door, he saw the men rise and the bag roll off Montgomery's lap. It was then that he entered the room gun drawn, in front of Allee, he believed, and picked up the bag. Observing that it contained white powder, he handcuffed the men and placed them against the wall.

Allee then went directly to a table near where Montgomery had been seated. As he opened its drawer he asked if there were any guns in the room. Cesar replied that one was in that drawer. Not seeing it, Allee asked again for the gun. Cesar said it was under the newspaper. Allee recovered the gun, finding also packets of a white powdered substance and marihuana. The only further search of the room at this point was a search of the closet and bathroom and under the bed. Coscia and Assiff were summoned to secure this room while Allee returned to room 1033. Creegan and Annunziata were sent to obtain search warrants for the two rooms.

At approximately 8:25 P.M., Annunziata telephoned to advise Allee that the warrant had been signed. It was at this point that the police searched the rooms completely, recovering some additional contraband and drug paraphernalia.

The testimony of defendants' witnesses differed markedly as to the nature of the entries into rooms 1033 and 947. As to room 1033, Maria Lezo testified that she heard persistent knocking at her door and opened the door without asking who was there. Three or four police officers walked in, pushing her against the wall, the same wall where the closet was, knocking her over a chair and onto the floor. She raised herself up, using the door knob of the closet door. She rushed into the bathroom, wrapped a towel around her and sat on the toilet frightened. She heard the chair she had knocked over being picked up, questioning taking place and other noises. Soon, a police officer opened the door of the bathroom, pointed a gun at her and told her not to move. He reached for a bag hanging on the door, which then made a "bang" sound against the door. The officer placed his hand into the bag and retrieved a gun. When Lezo walked back into the room, it looked like a "tornado hit it"; everything was strewn all over the room.

Lezo also remembered that the shades of the window were drawn down, the day was rainy and the only light in the room

came from the television set which was on and the bathroom light. Before the police entered, the bathroom door had been left open three quarters of the way. However, as she ran into the bathroom, she closed the door. The closet doors were shut.

Defendant Cesar also testified at the hearing. The police officers knocked on his door and announced their presence. He opened it a few inches to ask them what they wanted. They responded that they were investigating a narcotics complaint and then entered the room uninvited. Allee entered first and walked directly to Montgomery and placed him and the other man, Buckley, against the wall. He then walked to a dresser and asked Cesar, who was still by the door, whether there was a weapon in the room. Cesar told Allee that a gun was in the drawer. When Allee could not find the gun he hit Cesar in the face. Cesar told Allee that the gun was under the newspaper. Allee found it. He then searched and handcuffed Cesar. Creegan, meanwhile, was looking in the closet and bathroom. After finding the gun Allee searched under the bed, the mattress and the pillows, behind the steam heater, and inside the dresser drawers. A plastic bag containing white powder was found under the mattress. This search occurred before the warrant was obtained.

The People's evidence as a whole leaves no doubt in our minds that this is a classic, indeed textbook, example of evidence patently tailored to meet constitutional objections. In a case which conjures up practically every judicially recognized exception to the warrant requirement, consensual entry, "dropsy" evidence, plain view, spontaneous statements, not to mention the most alleged fortuitous set of facts imaginable, open closets, open drawers, and exceptionably cooperative suspects, I cannot imagine any other way to treat the People's case than as anything but incredible as a matter of law.

Except when the voluntariness of a consent is at issue, it is the defendant who bears the ultimate burden of proving that the seized evidence should not be used against him. (*People v Berrios,* 28 NY2d 361, 367; *People v Whitehurst,* 25 NY2d 389, 391.) Nevertheless, the People do have the important burden of always going forward to show the legality of the police conduct in the first instance and have the heavy burden of establishing consent. (*Supra.*) Implicit in this concept is the requirement that the testimony offered by the People be credible and not have the appearance of having been patently tailored to meet constitutional objections. (*People v Smith,* 77 AD2d 544, 545; *People v Quinones,* 61 AD2d 765, 766; *People v Garafolo,* 44 AD2d, at p 88.) Although issues of credibility are ordinarily for the trier of

fact to determine, that rule must give way when the testimony on appeal is viewed as incredible as a matter of law. (*Supra.*) Justice demands that we not place our imprimatur on conduct which clearly offends our common sense and common knowledge.

To begin with, we are asked to credit the police testimony that Mr. Gomez, the occupant of room 1444, who heard the police knock and announce their presence at his door, nevertheless opened his door and invited five police officers into his hotel room, despite the presence of narcotics in plain view on a dresser. Common sense dictates that such a scenario is simply unbelievable and does not have the ring of truth. (*See, People v Massiah,* 47 AD2d 931, 932 [court refused to credit tailored testimony of police officer that the codefendant would consent to a search of his hotel room, pursuant to a burglary investigation, when the contraband sought was in the room in open view].)

Rather, it is much more credible, as Gomez testified, that the police entered his room, without obtaining Gomez's consent, and conducted a search, finding only a small amount of narcotics. This then explains the otherwise odd fact that the police decided not to obtain a search warrant for this room. Having searched the room, they already knew the extent of narcotics there, which they could easily explain away with their prevaricated theory of plain view.

Lending further support to the conclusion that the People's testimony surrounding the entry into room 1444 was incredible is the equally implausible testimony with regard to the search of the Pernias' room. Annunziata testified that as he was on his way to court to obtain a search warrant for rooms 947 and 1033, he saw the Pernias and their children outside the hotel with their belongings, getting ready to leave. Despite the fear the Pernias must have had knowing that a narcotics investigation and arrests were taking place in the hotel and the anxiousness with which they must have wanted to get out of the hotel, Annunziata would have us believe that upon his request, the Pernias volunteered to accompany him back to their hotel room, which Annunziata then searched to no avail. Then, while admitting that a female police officer was summoned to the room, Annunziata could not recall whether Mrs. Pernia and her daughter were searched. There could not have been any other reason to summon the female officer. In fact, Mrs. Pernia testified that her luggage, her person and her daughter were all searched. All this because Creegan remembered that he saw a beeper in the room. It is simply incredible that the Pernias voluntarily consented to go back to their hotel room for a friendly interrogation and search.

It is in the context of this unbelievable testimony that we now turn to the entries into rooms 1033 and 947. It strains credulity to believe that Maria Lezo, a felon convicted of a narcotics charge, who was ill and barely dressed, would consent to the entry into the room of four police officers, who acknowledged they were conducting a narcotics investigation, while the defendant Martinez, who was a friend, not her husband, lay sleeping on a bed and, supposedly, while a closet door is left open revealing a bag of cocaine on a shelf, all dresser drawers are left open revealing additional contraband and drug paraphernalia, and a cocaine sniffer and marihuana cigarette are lying on the floor. The story we are asked to believe is obviously fictionalized to overcome every possible constitutional objection.

Yet, not even this story is perfect and, thus, there are some weak spots. For instance, it was only Annunziata who noticed that the closet door was open and a bag of cocaine was sitting on a shelf inside. However, he was the last officer to enter the room. And, while he was behind everyone else, it was only he who could see across the room and into a dresser drawer conveniently left open a few inches so that he could detect a millstile inside. Equally unconvincing is the fact that only Coscia saw the marihuana cigarette and cocaine straw sniffer on the floor, which items, for an undisclosed reason, were never vouchered.

We cannot help but conclude that no person would admit entry to police officers under these alleged circumstances. We also cannot believe that the police could ever be so fortunate as to have walked into a situation so perfect for them so as to enable them to meet every single possible constitutional objection. One does not even need to consider the defense testimony to rule that this testimony is incredible as a matter of law and that the People did not meet their heavy burden of establishing Maria Lezo's consent to entry into the room.

Not only do we have this incredible testimony of the police, but we have the contrary testimony of Maria Lezo, that when she opened the door she was knocked against the wall and fell to the floor when the officers suddenly barged into the room. In this regard the majority's opinion is wrong to claim "there is no indication that the police * * * forcibly gained admittance". Almost completely undressed and frightened, she rushed to the bathroom, from where she could hear the room being turned upside down. These facts comport far better with reality than what was told by the People's witnesses. Because there was no consent to enter the room and the tip alone was insufficient to justify a warrantless entry, we conclude that the police had no basis for entering this room and their unlawful entry tainted the

discovery of any contraband therein. Even were we to hold the entry valid, we would nevertheless refuse to credit the testimony as to the open closet door, the open dresser drawers and the contraband in plain view on the floor, which we conclude was tailored to meet the constitutional objections to the plainly improper warrantless search. With the suppression of the items seized pursuant to the entry to the room, there was no basis for securing a search warrant. Therefore, as to defendant Martinez, we would reverse and grant the motion to suppress in its entirety.

As if the strains of credulity were not pushed far enough, the officers also attempt to justify their warrantless entry into room 947 with yet more creative testimony. After announcing their presence and the nature of their investigation, and after Mr. Cesar's admitted delay in opening the door, it is claimed that, to the great fortune of the officers, who had been so lucky all day, one of the occupants of the room rose from his seat, dropped a plastic bag containing white powder and attempted to kick it under the bed. We cannot believe that any person, knowing the police are seeking entry and having had about a minute to discard any contraband, would wait until the police are entering the room to discard the contraband. Reading this testimony brings to mind all the criticism "dropsy" evidence has received in the past by commentators, prosecutors and judges alike, who have expressed alarm at the substantial potential for fabrication in these cases. (*See, e.g.,* dissenting opn of Chief Judge Fuld in *People v Berrios,* 28 NY2d, at pp 370-372.)

An equally independent ground for finding that the police action in entering room 947 was improper in the first instance is officer Allee's testimony that he entered the room before seeing the "dropsy" evidence. Although Annunziata thought he entered first and only entered after seeing the "dropsy" evidence, there is sufficient doubt as to who entered first so as to hold that the People did not establish that the alleged exigency situation preceded their warrantless and unconsented-to entry.

We find that the entry into defendant Cesar's room, which admittedly was nonconsensual, was not supported by any exigency to justify that warrantless entry. The unlawful entry tainted the discovery of any evidence therein, leaving no basis for obtaining a search warrant. Therefore, we would also reverse and grant defendant Cesar's motion to suppress in its entirety.