■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HERBERT GORDON, Appellant.—Judgment of the Supreme Court, Bronx County (Jerome Hornblass, J.), rendered on January 30, 1985, convicting defendant, following a jury trial, of criminal possession of a controlled substance in the third degree and sentencing him, as a second felony offender, to an indeterminate term of from 4½ to 9 years' imprisonment, is reversed, on the law, the motion to suppress defendant's statements granted and the matter remanded for a new trial.

Defendant was convicted of criminal possession of a controlled substance in the third degree as the result of an incident which occurred in The Bronx on May 10, 1984 at approximately 3:45 in the afternoon. According to police testimony, Detective James Davey, Sergeant Joseph Rooney and Police Officer O'Hagen were on routine patrol in an area noted for its drug transactions when they spotted defendant,

who was previously known to Sergeant Rooney from a previous arrest for the sale and possession of cocaine. Defendant was standing by himself on the northwest corner of 169th Street and Nelson Avenue holding what appeared to be a white tissue or paper towel in his hand. He approached the officers' car, and Sergeant Rooney engaged him in a brief conversation, inquiring as to what he was doing. Defendant replied that he was just hanging out on the corner. Sergeant Rooney then asked defendant what he had in the paper towel, to which defendant responded, "nothing, man, nothing".

Defendant then is alleged to have placed the towel into his pocket. This prompted the sergeant to exit the vehicle, position himself alongside defendant and demand to know what was in his pocket. Defendant began to back away from Sergeant Rooney, who reacted by grabbing at defendant's coat. At this point, defendant purportedly pushed the Sergeant against the car and started to flee, the officer in pursuit. In the meantime, Detective Davey had gotten out of the automobile and recovered the contents of the paper towel, dropped by defendant in the course of his flight, which consisted of 41 tinfoil packets. Sergeant Rooney, after chasing defendant for a number of blocks, eventually caught up with him in the basement of an abandoned building and placed him under arrest.

Defendant was subsequently removed to the precinct house where he was given his *Miranda* warnings. After defendant indicated that he understood his rights and was willing to answer questions without the presence of counsel, he was interviewed by Detective Davey and Sergeant Rooney regarding some robberies of which he disclaimed knowledge. Detective Davey then asked defendant how much money he made selling drugs, and the latter explained that he earned $1,000 a day. He added that if the officers permitted him to make a telephone call, he could have that amount brought to the station. Defendant was allowed to place his call while the Internal Affairs Division was informed of defendant's statement. Defendant's wife arrived on the scene with the $1,000 but returned home when her husband was not released. Thereupon, the officers, wearing recording devices, taped a conversation between themselves and defendant in the course of which defendant offered them $1,000. He was, consequently, arrested for bribery.

It is defendant's contention on appeal that his inculpatory statements should have been suppressed since they were the product of an arrest not based on probable cause. We agree.

The law is well established that before "the police may stop a person pursuant to the common-law right to inquire there must exist at that moment a founded suspicion that criminal activity is present" *(People v De Bour,* 40 NY2d 210, 215; see *also, People v Torres,* 115 AD2d 93). Even if defendant herein did indeed approach Sergeant Rooney and begin a conversation with him, he had a perfect right to refuse to answer any of the officer's questions and walk away at any time. *(People v Howard,* 50 NY2d 583.) As the Court of Appeals declared in that case (p 586), although "the police officer may endeavor to complete the interrogation, he may not pursue, absent probable cause to believe that the individual has committed, is committing, or is about to commit a crime, seize or search the individual or his possessions, even though he ran away."

The evidence before the hearing court clearly reveals that the police had not observed any criminal activity whatever on the part of defendant. Defendant was simply standing on the street corner. The fact that he was carrying a white paper towel in his hand is hardly susceptible of suspicious interpretation, nor is his placing the towel in his pocket. Since defendant was entirely warranted in declining to divulge the contents of the towel and to leave the scene at will, Sergeant Rooney was not authorized to grab defendant's coat or detain him in any way. Under these circumstances, defendant's shoving off the officer, which took place after he had been unlawfully prevented from departing, and apparently involved an effort on his part to break away from the officer's unlawful physical restraint, cannot be deemed a predicate for the ensuing arrest for possession. In that regard, the conclusion of this court in *People v Cornelius* (113 AD2d 666, 669), a case involving criminal possession of a weapon, is instructive: "With no inkling that criminal activity was afoot * * * there was no articulable reason for the police even to have questioned this defendant about the contents of his pockets. Accordingly, defendants response of 'nothing' was equivalent to his right not to respond at all *(see, People v Howard,* 50 NY2d 583, 586). Nothing in defendant's response 'made permissible any greater level of intrusion' *(supra,* at p 590)."

The situation in the instant matter is similar. In view of the complete absence of any indication of criminal activity, probable cause cannot be supplied by such tangential factors as Sergeant's Rooney's prior arrest of defendant, defendant's supposed nervousness or flight, the claim that the neighborhood was a known high-crime area, or even defendant's pushing of the officer. *People v Vasquez* (108 AD2d 701), which is

cited by the dissent, involved an entirely different fact pattern. In that case, the police officers had been assigned to execute arrest warrants, and defendant seemed to match the description in one of the warrants and was observed on the same street on which the individual mentioned in the warrant resided. When asked his name by the officers, defendant gave a name which varied from the one visible on a pill bottle protruding from defendant's left breast pocket. One of the officers pointed to the bottle and said, " 'That's your name.' " *(Supra, p 702.)* At that point, defendant slapped the officer's hand away with a backward motion, whereupon the two began to struggle. Thus, there was an adequate basis therein to support at least further inquiry. In the instant case, no such factors existed. Consequently, the arrest of defendant was made without probable cause, and he is entitled to suppression of any statements derived therefrom. Concur—Asch, Fein and Milonas, JJ. Ross, J., and Sandler, J. P., dissent, each in a separate memorandum, as follows:

Ross, J. (dissenting).

Based upon my analysis of the facts and legal authority, I find that the police had probable cause to arrest defendant in the instant case. Therefore, I would affirm Criminal Trial Term's denial of defendant's suppression motion.

Late in the afternoon of May 10, 1984, defendant was arrested in Bronx County. After his indictment for the crimes of criminal possession of a controlled substance in the third degree (Penal Law § 220.16) and bribery in the second degree (Penal Law § 200.00), defendant moved to, *inter alia,* suppress incriminating statements that he made following his arrest. In response to that motion, a hearing was held. The primary witness for the People was New York City Police Sergeant Joseph Rooney (Rooney), who at the time of the defendant's arrest was a veteran of approximately 14 years of service.

According to Rooney's testimony, on May 10, 1984, at approximately 3:45 P.M. he, together with two other police officers, Detective James Davey (Davey) and Police Officer O'Hagen, was assigned to the 44th Precinct Robbery Identification Program; these officers were in plain clothes on a routine motor patrol in an unmarked police vehicle; Rooney was seated in the front passenger seat; these officers were traveling south on Nelson Avenue; and, when their vehicle approached the intersection at West 169th Street and Nelson Avenue, they stopped at a stop sign. Furthermore, Rooney testified that this intersection of West 169th Street and Nel-

son Avenue was known to the police as "a very very high drug location, particularly cocaine".

Moreover, Rooney testified that, when the vehicle was stopped at the subject stop sign, Rooney observed defendant standing by himself on the northwest corner of 169th Street and Nelson Avenue; the defendant was "carrying a white object in his hand, which appeared to be tissuepaper or * * * a paper towel * * * wrapped up in his hand"; Rooney knew defendant, since he had arrested him in that location three or four months previously "for sale and possession of cocaine"; the defendant also observed the officers, and, while carrying the subject white object, "immediately began walking over to the vehicle"; and, as the defendant arrived at the vehicle, in Rooney's opinion "as an experienced police officer * * * [defendant] appeared very frightened at that point". While he was seated inside the police vehicle, Rooney testified that "[defendant, who was standing outside] and I engaged in brief conversation at which time I asked him what he was doing, and he said that he was just * * * hanging out on the corner; and that he was keeping low because * * * [he was on] probation * * * With that I asked him what he had in his hand, in the white paper towel and he stated to me, 'Nothing, man, nothing' ". Thereafter, Rooney testified that as defendant "started to put * * * the white towel into his coat pocket * * * I started out of the vehicle". Furthermore, Rooney testified that defendant now began backing away from the vehicle, and "as he backed away from the automobile, I asked him again what he had in his hand, and at that point I reached for him, as he was backing away, and when I grabbed ahold of his coat * * * he shoved me and pushed me up against the car. I fell off the car, got back up and went after him, and when I grabbed ahold of him, he was holding onto his coat but me managed to get his coat off and with that he took off, he droped [sic] the white paper towel on the ground". In order to specifically clarify this physical encounter between Rooney and the defendant, the hearing court conducted an examination of Rooney, as follows:

"THE COURT: Well, did you at that time touch him [defendant]? Did you seize him?

"THE WITNESS [ROONEY]: I didn't seize him, your Honor. I merely wanted to talk to him and question him, his continued backing up and away from me and his nervous manner by placing his hand in his pocket mde [sic] me fearful at that point for my own personal safety and at that point I wanted to get him in a position where I could tell him to take his hand

out of his pocket, so I could continue to question him, and before I could do anything else, * * * [defendant] * * * threw me against the car" (emphasis added).

In pertinent part, defendant's hearing counsel followed up the hearing court's inquiry, mentioned *supra,* by asking these questions of Rooney and receiving these answers:

"[BY MR. DOGIN] Q What happened after you grabbed for him?

"[THE WITNESS ROONEY] A I just explained. He pushed me and threw me over the vheicle.

"Q Go ahead, what happened then?

"A At that point I got up off the floor and I started to chase him. I managed to grab ahold of his coat and he managed to pull his coat off of him and I was holding onto his coat, and he continued to run.

"Q He [defendant] is a pretty big guy. Was he running fast?

"A Fast enough".

Rooney testified that he summoned additional officers over the radio and chased the defendant for a number of blocks. Finally, Rooney testified "myself and several other officers entered an abandoned building at 169th Street and Nelson Avenue, where we conducted a search and in the basement of the building we located the defendant * * * laying in the bottom of some rubble in the basement". At that point, Rooney testified that he placed defendant under arrest "[f]or criminal possession of a controlled substance", based upon the fact that Detective Davey had found in the subject white object dropped by defendant a "clear plastic bag with * * * 41 tin foils." It is undisputed that these tinfoils contained in excess of five eighths of an ounce of cocaine.

The defendant was taken to the 44th Police Precinct, where Davey read defendant the *Miranda* warnings in the presence of Rooney. After defendant received these warnings, Davey testified that a conversation took place between defendant, Rooney and Davey, and during that conversation: "I [Davey] asked him if he knew about any * * * robberies at that location, 169th Street and Nelson Avenue. I also asked him how much money he made a day selling drugs at that location". In response to those two questions, according to Davey, defendant answered that he knew nothing about any robberies, but that "he made a thousand dollars a day" selling drugs. Furthermore, Davey testified that: "At that point [defendant] said that if you let me make a phone call, I can have a thousand dollars brought to the precinct". As a result of

defendant's offer of $1,000 to Rooney and Davey, they informed the Internal Affairs Division (IAD) of the Police Department of the defendant's offer. While these officers were waiting for the IAD officers to arrive, defendant was permitted to make a telephone call to his wife, and, in the course of that telephone call, defendant gave her directions as to how to find the precinct and told her to bring $1,000 with her. Subsequently, defendant's wife arrived at the precinct with a bag and a pair of pants, and the officers permitted her to meet with the defendant alone in a precinct interview room for approximately 15 minutes. In the meantime, officers from IAD arrived at the precinct, and outfitted Rooney and Davey with recording devices. After being wired, these officers returned to the interview room where the defendant was located, and Davey testified "[defendant] carried out the thousand dollars, gave it to us [Davey and Rooney] * * * Rooney counted it again. I asked [defendant], 'Is this the thousand dollars?' He said, 'yes,' and that was it". Thereafter, defendant was arrested for bribery.

The defendant neither testified himself at the hearing nor did he summon any other witnesses.

Following the receipt of all of the evidence, the hearing court denied the defendant's motion to suppress. In pertinent part, the hearing court found: "[T]he police acted properly. I find the police officers to be credible * * * The police officers do have a common law right to inquire, to stop a person in an area, particularly a person that is known to them to be a defendant in previous incidents, and in a high-crime area. They certainly have an absolute * * * right to make inquiry which is what they did, and they had probable cause to believe that a crime was being committed after the defendant alighted from the scene and caused the chase * * * The statements were given after the defendant was in custody and were given in the police station, and * * * I * * * determine * * * the rights were given to him and the statements offered by the defendant were voluntarily made without any kind of compulsion * * * So the motion is denied in its entirety".

I consider the findings of the hearing court very persuasive. Witness credibility was the issue before that court, and, as mentioned *supra,* it found the officers' testimony credible. This court has repeatedly held that the trier of facts is in the best position to determine credibility, since it observes the witnesses in the crucible of the courtroom *(see, for example, People v Wright,* 71 AD2d 585, 586 [1st Dept 1979]; *People v Stroman,* 83 AD2d 370, 372 [1st Dept 1981]; *People v Cesar,*

111 AD2d 707, 710 [1st Dept 1985]). I find particularly applicable herein these words that we wrote in *People v Wright (supra,* at p 586): "Credibility is determined by the trier of facts who has the advantage of observing the witnesses and necessarily is in a superior position with respect to that aspect than an appellate court which reviews but the printed record (see *People v Cohen,* 223 NY 406, 422-423; Fisch, New York Evidence, § 446)".

As mentioned *supra,* prior to Sergeant Rooney being shoved to the ground by the defendant, Rooney, other than reaching for the defendant in order to protect himself, had limited himself to the minimum degree of intrusion necessary, which was merely to talk to defendant. It should not be overlooked that the credible evidence indicates that defendant was not ordered over to the officers' car; but, rather, that he approached it voluntarily. Furthermore, there is no evidence that Rooney at any time during the incident drew his service revolver, and defendant does not contend that he did.

Since the defendant and Rooney, as mentioned *supra,* knew each other from defendant's previous arrest by Rooney, there is no issue in this case that defendant did not know that Rooney was a police officer when he threw Rooney to the ground.

For the sake of discussion, even if Rooney did grab defendant's arm or coat, I find that there is no legal authority that justified defendant's excessive reaction of shoving Rooney with both hands "over a car." We unanimously held in *People v Vasquez* (108 AD2d 701, 703 [1st Dept 1985]) that: "Ordinarily, a person addressed by a police officer does have an equal right to ignore his interrogator and walk away *(see, United States v. Mendenhall,* 446 US 544). This should not, however, be read to mean that one may strike out at a police officer in doing so" Therefore, applying our holding in *People v Vasquez (supra)* to the facts of the instant case, I conclude that, as soon as defendant assaulted the officer by shoving him to the ground, the officer, in turn, was entitled to apprehend, arrest and frisk the defendant.

In my opinion, the facts in the instant case overwhelmingly support the conclusion that the police conduct was reasonable. In *People v Chestnut* (51 NY2d 14, 23), the Court of Appeals held: "Courts simply must not, in this difficult area of street encounters between private citizens and law enforcement officers, attempt to dissect each individual act by the policemen; rather, the events must be viewed and considered as a

whole, remembering that reasonableness is the key principle when undertaking the task of balancing the competing interests presented".

The credible evidence indicates that when the officer reached for the defendant, he was not going on a fishing expedition for evidence of criminality, but rather was simply seeking to protect himself. Rooney testified:

"Q [BY MR. PLANZOS, ASSISTANT DISTRICT ATTORNEY]: Officer, at any time did you fear for your safety when the defendant first approached your automobile and you were not able to view his hands?

"A [ROONEY]: That's correct."

The Supreme Court of the United States in *Terry v Ohio* (392 US 1, 27) ruled: "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger [citations omitted]. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience". Applying the holding of *Terry v Ohio (supra)* to the facts in the instant case, I find Rooney's action in reaching for defendant to be entirely reasonable.

Subsequent to the denial of the defendant's suppression motion, a jury found the defendant guilty of the crime of criminal possession of a controlled substance in the third degree, and thereafter defendant was sentenced, as a second felony offender, to an indeterminate term of imprisonment of from 4½ to 9 years.

As mentioned *supra*, I find that the hearing court did not err in denying the motion to suppress. In addition, I have examined defendant's other contentions of error concerning the judgment of conviction, and find those contentions also lack merit. Accordingly, I would affirm the judgment.

Sandler, J. P. (dissenting).

I am in agreement with that part of Judge Ross' dissenting opinion which concludes that the officer was justified in pursuing the defendant and thereafter arresting him, after the defendant shoved the officer over a car.